# Illinois Official Reports

## Appellate Court

---

### *People v. Buffer*, 2017 IL App (1st) 142931

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Respondent-Appellee, v. DIMITRI BUFFER, Petitioner-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-14-2931 |
| Filed<br>Rehearing denied | March 29, 2017<br>April 25, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-10493; the Hon. Thaddeus Wilson, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Christopher L. Gehrke, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Matthew Connors, Noah Montague, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.<br>Justice Lavin concurred in the judgment and opinion.<br>Justice Pucinski specially concurred, with opinion. |

**OPINION**

¶ 1    The petitioner, Dimitri Buffer, appeals from the circuit court's summary dismissal of his *pro se* postconviction petition filed pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2004)). On appeal, the petitioner contends that his 50-year adult sentence, imposed for a crime he committed when he was 16 years old, is unconstitutional as applied under the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and under Illinois's proportionate penalties clause (Ill. Const. 1970, art. I, § 11). For the reasons that follow, we vacate the petitioner's sentence and remand for resentencing.

¶ 2                                I. BACKGROUND

¶ 3    For purposes of brevity we set forth only those facts and procedural history relevant to the resolution of the issues in this appeal. In 2009, the 16-year-old petitioner was charged with multiple counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2008)) in the shooting of the victim, Jessica Bazan, including that he personally discharged the firearm that caused her death. The petitioner was transferred to be tried as an adult under the mandatory transfer provision of the Juvenile Court Act of 1987 (705 ILCS 405/5-120 (West 2008)).

¶ 4                                    A. Trial

¶ 5    The following evidence was adduced at the petitioner's jury trial. Serena Ortiz and her 10-year-old son, Jai Cuevez, testified that on the evening of May 16, 2009, they were inside their second-floor apartment at 8311 South Brandon Avenue. At about 10 p.m., Ortiz was speaking on the telephone, while Cuevas was looking out the window and saw Bazan (who was Ortiz's uncle's fiancée) pulling up in front of the building in her red Chevrolet Caprice. Ortiz looked out the window, waved to Bazan, and told her "to hold on" while she finished her conversation in another room. Cuevas continued to look out the window. When Ortiz returned, both she and Cuevas saw a figure in a black hoodie approach Bazan's car, fire two shots inside, and run toward a white "cop" or "bubble" (Ford Crown Victoria) car, which they identified from a photo at trial. Neither Ortiz nor Cuevas could see the offender's face because it was too dark.

¶ 6    The forensic pathologist who performed the autopsy on Bazan testified that Bazan was shot twice in her right thigh and died as a result of those wounds.

¶ 7    Sammy Trice, age 23 and a former member of the Black P Stones gang, next testified that at about 9:30 p.m., on May 16, 2009, he and Steven Ward drove Ward's white Ford Crown Victoria, previously identified by Ortiz and Cuevas as the vehicle used by the offender to flee the scene of the shooting, to pick up four minors: (1) Trice's 15-year-old cousin, Mark Matthews, who remains a member of the Black P Stones; (2) 14-year-old Devon Brunt; (3) 16-year-old Devaunte Johnson; and (4) the 16-year-old petitioner.

¶ 8    Trice averred that he drove the car to an alley on 83rd Street between Coles Avenue and South Shore Drive because he wanted to purchase marijuana. Trice explained that the Black P Stones had a "stash house" where they kept their drugs and "nation guns," which were available for use to all members. Once there, Trice and the petitioner exited the car, and the petitioner went to the "stash house." Upon his return, Trice proceeded to drive down Brandon Avenue and stopped at a stop sign to "roll a blunt," when he heard the petitioner say "There go

them guys right there." According to Trice, the petitioner then exited the vehicle, walked toward the passenger side of a parked red vehicle and fired shots inside. Trice claimed that he tried to flee in Ward's car, but the petitioner ran after him and jumped inside. Trice "hollered and cursed" at the petitioner to get out, and as he pulled into an alley, the petitioner jumped out and fled. Soon thereafter Trice was pulled over by the police, and all five men were arrested and taken into custody. Once there, Trice identified the petitioner as the shooter from a photo array. He again identified the petitioner as the shooter in open court.

¶ 9        On cross-examination, Trice acknowledged that when he was brought to the police station, he thought that he was being arrested for Bazan's murder. Trice admitted that he initially lied to police about what he saw. He explained that the police told him that both he and his cousin, Matthews, would be charged with murder, and he did not want that to happen. Trice acknowledged that he did not identify the petitioner from a photo array until 9:12 a.m. on the following morning, after speaking to his mother and to the detectives, who told him that Matthews's story was "falling apart."

¶ 10       Matthews, age 15, testified consistently with Trice. In addition, he provided testimony regarding the motive for the shooting. Specifically, Matthews testified that two days prior to the shooting, he was near a store on 83rd Street and Cottage Grove Avenue when he was approached by a group of rival Latin King gang members, who asked him if he was a Black P Stone. Matthews stated that when he answered in the affirmative, they "jumped him," striking him several times and causing multiple abrasions on his face. Matthews's aunt filed a police report in regard to this incident.

¶ 11       Matthews averred that at about 9 p.m. on the day of the shooting, he was playing basketball with Brunt, Johnson, and the petitioner when a red car pulled up and several individuals inside, whom Matthews identified as members of the Latin Kings, "threw their gang signs" at them. Soon thereafter, Trice appeared in a white car with Ward and drove them all to a house where the Black P Stones kept their drugs and weapons. Contrary to Trice's testimony, Matthews averred that the petitioner alone exited the car, went to the stash house, and returned several minutes later. Matthews testified that later when Trice stopped the car at a stop sign on Brandon Avenue, the petitioner exited the car and fired gunshots toward a red car that was parked on the street and that looked like the car belonging to the Latin Kings who had flashed their gang insignia at them earlier that day.

¶ 12       On cross-examination, Matthews admitted that he initially lied to the police about who had committed the crime and implicated James Jones (James), who is a member of a rival gang, the Apache Stones. He eventually identified the petitioner as the shooter and picked him out of a photo array. Matthews explained that he did not identify the petitioner as the shooter until the detectives returned and told him that his cousin, Trice, and Ward had not implicated James but had instead identified the petitioner as the shooter.

¶ 13       The owner of the white Ford Crown Victoria, Ward, next testified that he uses this vehicle to "taxi" locals around the neighborhood because regular taxi cab companies do not venture to that area of Chicago. He explained that on May 16, 2009, he loaned his car to Trice and together they picked up and drove three of Trice's friends, whom Ward did not know. Ward testified consistently with Trice and Matthews about what transpired that evening, including his witnessing of the shooting. Ward, however, did not identify the petitioner as the shooter (either when he was arrested by the police or at trial).

¶ 14    Several police officers testified to their efforts in arresting the suspects after receiving a flash message describing the getaway vehicle. The officers arrested all five individuals inside the vehicle (Trice, Brunt, Johnson, Matthews, and Ward) and performed gunshot residue tests on them. All of those tests were negative for gunshot residue.

¶ 15    Aisha Jones (Jones), age 17 and the petitioner's brother's girlfriend as well as the sister of James Jones, next testified that the petitioner is "like a little brother to her." She testified that in 2009, both the petitioner and his brother were members of the Black P Stones gang.

¶ 16    Jones testified that at about 10 p.m. on the night of the shooting, she was with the petitioner's brother when he received a telephone call and eventually proceeded to the corner of 81st Street and Coles Avenue, where they picked up the petitioner. Jones testified that the petitioner, who was wearing a navy blue hoodie, entered the car and said, "I just shot a [Latin] King in his face." Jones testified that everyone in the car asked the petitioner "if he be for real" because the petitioner often joked around and was a playful person. The petitioner "swore to God" and "on Jeff [Fort, the head of the Black P Stones gang]" that he was telling the truth.

¶ 17    Jones testified that on the following morning, she also heard the petitioner telling his brother that "he shot a King in the face." According to Jones, when the petitioner's brother mentioned a woman, the petitioner told him that he "shot a King" and "didn't shoot no lady."

¶ 18    On cross-examination, Jones explained that she was not concerned about what she had heard from the petitioner because he "always play like this." Jones also admitted that she did not go to the police station to make a statement about what she had heard, until later that day when she found out that her brother, James, had been arrested in connection with the shooting.

¶ 19    Chicago police detective Michele Moore-Grose also testified that in investigating the instant case, she interviewed the responding officers and several witnesses, including Ortiz and Cuevas. The detective afterward interrogated all five suspects (Trice, Ward, Matthews, Johnson, and Brunt) that were arrested in the white Ford Crown Victoria near the scene of the shooting. She acknowledged that after speaking to Matthews, her investigation first focused on James, whom she arrested on May 17, 2009. She explained, however, that after further interrogation of the witnesses and after speaking to Aisha Jones, her investigation changed course and focused on the petitioner.

¶ 20    The defense offered no evidence at trial. After hearing closing arguments, the jury found the petitioner guilty of four counts of first degree murder. The jury also specially found that the petitioner had personally discharged the firearm that proximately caused Bazan's death.

¶ 21                                    B. Sentencing

¶ 22    At the sentencing hearing, the court first heard the victim impact statement written by the victim's mother. Subsequently, in aggravation, the State called several police officers to testify to incidents in which the petitioner had been arrested when he was just 14 and 15 years old. Specifically, the officers testified to having previously arrested the petitioner for (1) a burglary in progress, wherein the petitioner was found in the "back seat of a vehicle" where the ignition was peeled and the vehicle was reported stolen; (2) attempted robbery, where the 15-year-old petitioner tried to take money from an 18-year old victim's pocket and hit the victim; (3) resisting arrest, when the petitioner, together with several other members of the Black P Stones gang, "interfered in the placing into custody of another narcotics related arrestee";

(4) robbery, wherein the victim identified several individuals who had battered him and taken his wallet, including the petitioner; and (5) "flashing gang signs."

¶ 23    In contrast to the officers' testimony, the petitioner's presentencing investigation report (PSI), which was introduced at the sentencing hearing, reflected only a single finding of delinquency for theft.

¶ 24    In mitigation, defense counsel argued that the petitioner was remorseful, that he was 16 years old at the time of the shooting, that his parents have been present in court and in his "entire life," that he has no history of mental illness, and that he struggled with school but had completed two years of high school with special assistance classes. In addition, defense counsel explained that the defendant's previous arrests can be explained by the fact that he "exists in a world where there is violence" and "senseless deaths." Counsel also emphasized that the petitioner was not alone and that he was very susceptible to the influence of others. In allocution, the petitioner apologized for what had happened to the victim's family and expressed that he was "really sorry."

¶ 25    The State argued that the petitioner's arrests as a minor showed "the making of a gang member" and contended that the petitioner "had choices at the age of 14 and yet continued again and again to commit crimes." The State claimed that the petitioner "chose to be a Black P Stone" and that he "chose to have that life." The State further argued for an extended sentence in order "to deter others from committing the same crime" and "to send a message" to the community and to gang members. As the State explained, "these sentences are necessary to deter others from that conduct."

¶ 26    After hearing arguments by both parties, the circuit court sentenced the petitioner to 50 years' imprisonment with 3 years of mandatory supervised release. In doing so, the court stated that it had "considered all of the relevant statutory requirements, including, but not limited to" (1) the evidence at trial, (2) the gravity of the offense, (3) the PSI, (4) the financial impact of incarceration to a limited extent given the petitioner's age, his not having children or dependents, (5) evidence in aggravation and mitigation, (6) potential substance abuse issues, (7) treatment, (8) potential for rehabilitation, (9) the possibility of alternative sentencing, (10) the petitioner's statement in allocution, (11) the victim impact statement, and (12) "all hearsay considered at the hearing deemed relevant and reliable."

¶ 27                                    C. Direct Appeal

¶ 28    The petitioner filed a direct appeal with this court on June 27, 2011, arguing that (1) the trial court had improperly admitted Trice's prior consistent statements from his grand jury testimony to bolster his and Matthews's testimony at trial and (2) the State committed error in its rebuttal remarks when it improperly bolstered Jones's testimony. See *People v. Buffer*, 2012 IL App (1st) 102411-U, ¶¶ 48, 70.

¶ 29    During the pendency of this appeal, on June 25, 2012, the United States Supreme Court decided *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455 (2012), holding that because juvenile offenders are less culpable than adults who commit the same crime and are far more capable of rehabilitation, a mandatory sentence of life without the possibility of parole violates the eighth amendment.

¶ 30    On July 24, 2012, the petitioner filed a motion seeking leave to file a supplemental brief addressing the impact of *Miller* on his 50-year sentence. The State objected, and we denied

leave on August 7, 2012. On August 9, 2012, the petitioner filed a motion to reconsider, and the State responded, renewing its objection.

¶ 31 On August 16, 2012, we affirmed the petitioner's conviction. See *Buffer*, 2012 IL App (1st) 102411-U, ¶¶ 61, 74. In doing so, we agreed with the petitioner that Trice's grand jury testimony was inadmissible and constituted an abuse of the trial court's discretion. In addition, we stated that we were "inclined to agree" that the scope of the State's rebuttal "exceeded the bounds of proper comment" since it was "not based upon any facts or reasonable inferences in the record." *Buffer*, 2012 IL App (1st) 102411-U, ¶ 74. Nonetheless, we found that in light of the overwhelming evidence of the petitioner's guilt, these errors did not rise to the level of plain error so as to permit our review. See *Buffer*, 2012 IL App (1st) 102411-U, ¶ 75.

¶ 32 On August 17, 2012, a day after we issued our Rule 23 order, we also denied as moot the petitioner's motion to reconsider our denial of his request to supplement his brief to address his sentence in the context of *Miller*, 567 U.S. 460, 132 S. Ct. 2455.

¶ 33 The petitioner subsequently sought leave to appeal to our supreme court, but his petition was denied. See *People v. Buffer*, No. 115148 (Ill. Jan. 30, 2013) (table).

¶ 34                                                 D. Post-Conviction

¶ 35 On May 23, 2014, the petitioner filed a *pro se* postconviction petition, arguing that his 50-year sentence is a *de facto* life sentence that violates the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). The petitioner cited to *Miller*, 567 U.S. 460, 132 S. Ct. 2455, and several Illinois decisions relying on *Miller*, and emphasized the diminished culpability of juveniles and their enhanced rehabilitative capacity. The petitioner asked the court to vacate his sentence and remand for a new sentencing hearing "so that petitioner is able to re-enter society as a productive and useful citizen."

¶ 36 The circuit court summarily dismissed the petitioner's pleading, finding his claims to be "frivolous and patently without merit." The petitioner now appeals the summary dismissal of his petition.

¶ 37                                                 II. ANALYSIS

¶ 38 At the outset we note that the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)) provides a three-step process by which a convicted defendant may assert a substantial denial of his or her constitutional rights in the proceedings that led to the conviction. *People v. Edwards*, 2012 IL 111711, ¶ 21; *People v. Tate*, 2012 IL 112214, ¶ 8; see also *People v. Walker*, 2015 IL App (1st) 130530, ¶ 11 (citing *People v. Harris*, 224 Ill. 2d 115, 124 (2007)). A proceeding under the Act is a collateral attack on a prior conviction and sentence and is therefore "not a substitute for, or an addendum to, direct appeal." *People v. Kokoraleis*, 159 Ill. 2d 325, 328 (1994); see *Edwards*, 2012 IL 111711, ¶ 21; *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). Accordingly, any issues that were decided on direct appeal are *res judicata*, and any issues that could have been presented on direct appeal, but were not, are waived. *Edwards*, 2012 IL 111711, ¶ 21; see also *People v. Reyes*, 369 Ill. App. 3d 1, 12 (2006).

¶ 39 At the first stage of a postconviction proceeding, such as here, the trial court must only determine whether the petition sets forth a "gist" of a constitutional claim. *People v. Boclair*,

202 Ill. 2d 89, 99-100 (2002); see also 725 ILCS 5/122-2.1 (West 2012); *People v. Ross*, 2015 IL App (1st) 120089, ¶ 30 (citing *People v. Jones*, 213 Ill. 2d 498, 504 (2004)). At this stage of postconviction proceedings, all well-pleaded allegations in the petition must be construed as true, and the court may not engage in any factual determinations or credibility findings. See *People v. Plummer*, 344 Ill. App. 3d 1016, 1020 (2003) ("The Illinois Supreme Court *** [has] recognized that factual disputes raised by the pleadings cannot be resolved by a motion to dismiss at either the first stage *** or at the second stage *** [of postconviction proceedings], rather, [they] can only be resolved by an evidentiary hearing ***."); see also *People v. Coleman*, 183 Ill. 2d 366, 380-81 (1998) (noting that the supreme court has "foreclosed the circuit court from engaging in any fact-finding at a dismissal hearing because all well-pleaded facts are to be taken as true at this point in the proceeding").

¶ 40    The "gist" is a low threshold, and the trial court may summarily dismiss the petition only if it finds the petition to be frivolous or patently without merit. See *Jones*, 213 Ill. 2d at 504; *Ross*, 2015 IL App (1st) 120089, ¶ 30; see also *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). A petition is frivolous or patently without merit only if it has no arguable basis either in law or in fact. *People v. Tate*, 2012 IL 112214, ¶ 9. Our supreme court has explained that a petition lacks an arguable basis where it "is based on an indisputably meritless legal theory or a fanciful factual allegation"—in other words, an allegation that is "fantastic or delusional," or is "completely contradicted by the record." (Internal quotation marks omitted.) *Hodges*, 234 Ill. 2d at 13, 16; *People v. Brown*, 236 Ill. 2d 175, 185 (2010); see also *Ross*, 2015 IL App (1st) 120089, ¶ 31. Our review of summary dismissal is *de novo*. *Tate*, 2012 IL 112214, ¶ 10.

¶ 41    On appeal, the petitioner contends that the trial court erred when it summarily dismissed his *pro se* petition because he made the gist of a meritorious claim that his 50-year sentence violated his constitutional rights both under the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).

¶ 42    The petitioner explains that the sentencing statutes under which he was sentenced mandated that the trial court sentence him to a minimum of 45 years in prison—specifically, a minimum of 20 years for first degree murder (see 730 ILCS 5/5-8-1(a)(1)(a) (West 2008) (providing a range of 20 to 60 years)) plus a mandatory 25-year firearm enhancement (see 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2008) (requiring 25 years to be added to a murder sentence if a firearm was used that proximately caused the death of the victim)). Accordingly, even though the trial judge sentenced the petitioner at the bottom of the applicable first degree murder range, his aggregate sentence totaled 50 years. In addition, the petitioner points out that under the "truth in sentencing" statute, he is required to serve this sentence in its entirety. See 730 ILCS 5/3-6-3(a)(2)(i) (West 2008) ("a prisoner who is serving a term of imprisonment for first degree murder *** shall receive no [sentence] credit and shall serve the entire sentence imposed by the court"). The petitioner argues that this lengthy term is equivalent to a mandatory life sentence. Accordingly, he contends that because the interaction of the aforementioned statues prevented the trial court from exercising any discretion or taking into consideration his youth and rehabilitative potential the overall effect of the statutory scheme as applied to him violated both the eighth amendment of the federal constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).

¶ 43    A strong presumption exists that statutes are constitutional and courts will uphold a statute whenever reasonably possible, resolving all doubts in favor of the statute's validity. *People v. Patterson*, 2014 IL 115102, ¶ 90. In addition, the challenging party has the burden of rebutting this presumption. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 43. We review a statute's constitutionality *de novo*. *Patterson*, 2014 IL 115102, ¶ 90.

¶ 44                           A. Eighth Amendment—As Applied to the Petitioner

¶ 45    We first turn to the petitioner's assertion that his 50-year sentence is effectively a mandatory life sentence that is prohibited under the federal constitution. The eighth amendment to the United States Constitution, which is applicable to the States through the fourteenth amendment, provides: "Excessive bail shall not be required nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII. This amendment guarantees individuals the right not to be subjected to excessive sanctions and reaffirms the government's duty to respect the dignity of all persons. *Roper v. Simmons*, 543 U.S. 551, 560 (2005). The amendment flows from the basic precept that the punishment for crimes should be graduated and proportioned to the offense. *Roper*, 543 U.S. at 560. The Supreme Court has repeatedly held that the prohibition against cruel and unusual punishment must be interpreted through "the evolving standards of decency that mark the progress of a maturing society." (Internal quotation marks omitted.) *Roper*, 543 U.S. at 561.

¶ 46    The United States Supreme court has repeatedly recognized the special characteristics of juvenile offenders, including: (1) that they lack maturity and have an underdeveloped sense of responsibility which leads to poor decision making (*Roper*, 543 U.S. at 569); (2) that they are more susceptible to negative influences and peer pressure and therefore lack the ability to extricate themselves from "horrific, crime-producing settings" (*Miller*, 567 U.S. at ___, 132 S. Ct. at 2464; *Graham v. Florida*, 560 U.S. 48, 68 (2010)); and (3) that they are more capable of change than adults and less likely to be of "irretrievably depraved character" (*Graham*, 560 U.S. at 68).

¶ 47    In recognition of these characteristics, in the last 15 years, the Supreme Court has decided four landmark opinions applying the eighth amendment to juveniles. In *Roper*, the Supreme Court held that the eighth amendment prohibits the imposition of the death penalty where an offender was under 18 years old when he committed the offense. *Roper*, 543 U.S. at 578. Five years, later, in *Graham*, the Supreme court held that the eighth amendment prohibited the imposition of life without parole on a juvenile offender who did not commit homicide. *Graham*, 560 U.S. at 74.

¶ 48    During the pendency of the petitioner's direct appeal, in *Miller*, the Supreme Court held that the eighth amendment "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. Citing its earlier decisions in *Roper* and *Graham*, the Court explained that "children are constitutionally different from adults for purposes of sentencing" (*Miller*, 567 U.S. at ___, 132 S. Ct. at 2464) and that "in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult" (*Miller*, 567 U.S. at ___, 132 S. Ct. at 2468). The Supreme Court emphasized that a mandatory sentencing scheme for juveniles prevents the trial court from considering numerous mitigating factors, such as the juvenile offender's age and attendant characteristics; the juvenile's family and home environment and the circumstances of the offense, including the extent of the juvenile's participation and the effect of any familial

or peer pressure; the juvenile's possible inability to interact with police officers or prosecutors or incapacity to assist his or her own attorneys; and "the possibility of rehabilitation even when the circumstances most suggest it." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2468. The Court concluded:

> "[A] judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles. By requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory sentencing schemes before us violate this principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2475.

¶ 49 The Court further clarified that its holding was not a categorical prohibition of life-without-parole sentences for juvenile murderers. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. Rather, the Court's holding required that life-without-parole sentences be based on judicial discretion rather than statutory mandates. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469.

¶ 50 Most recently, in *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 732-34 (2016) the United States Supreme Court elaborated on its ruling in *Miller*, holding that *Miller* was retroactive on state collateral review because it announced a new substantive constitutional rule. *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 732-34. In doing so, the Supreme Court explained that the "central substantive guarantee" of the amendment is protection against disproportionate punishment and that *Miller* was based on a "line of precedent holding certain punishments disproportionate when applied to juveniles." *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 732. The Supreme Court further found that this eighth amendment protection "goes far beyond the manner of determining a defendant's sentence." *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 732-33.

¶ 51 The Court in *Montgomery* analyzed the principal premise of *Miller* that children are constitutionally different from adults for purposes of sentencing because of their diminished culpability and better prospect of reform. *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 732-33. The Court noted that *Miller* did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; instead it established that "the penological justifications for life without parole collapse in light of 'the distinctive attributes of youth.' [Citation.]" *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734. As the Court in *Montgomery* explained:

> "Because *Miller* determined that sentencing a child to life without parole is excessive for all but ' "the rare juvenile offender whose crime reflects irreparable corruption," ' [citation], it rendered life without parole an unconstitutional penalty for 'a class of defendants because of their status'—that is, juvenile offenders whose crimes reflect the transient immaturity of youth. [Citation.] As a result, *Miller* announced a substantive rule of constitutional law. Like other substantive rules, *Miller* is retroactive because it ' "necessarily carr[ies] a significant risk that a defendant" '—here, the vast majority of juvenile offenders—' "faces a punishment that the law cannot impose upon him." ' [Citation.]" *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734.

¶ 52 On appeal, the State initially contends that the petitioner failed to set forth a gist of a meritorious claim of an eighth amendment violation because *Miller* applied only to mandatory life sentences without the possibility of parole, and not to discretionary sentences, such as the

one here, where the trial court had the ability to consider the petitioner's mitigating evidence and criminal history before imposing the minimum sentence. We acknowledge that when the parties filed this appeal, our appellate court had split on this issue, with some holding that under *Montgomery*, *Miller*'s prohibition against mandatory life sentences without parole for juveniles applied equally to discretionary life sentences without parole (see, *e.g.*, *People v. Nieto*, 2016 IL App (1st) 121604, ¶¶ 46-49; *People v. Ortiz*, 2016 IL App (1st) 133294, ¶¶ 16-25; *People v. Gipson*, 2015 IL App (1st) 122451), while others maintained that *Miller* was reserved for mandatory sentences alone (see, *e.g.*, *People v. Wilson*, 2016 IL App (1st) 141500, ¶ 30; *People v. Cavazos*, 2015 IL App (2d) 120444, ¶¶ 87-88; *People v. Banks*, 2015 IL App (1st) 130985, ¶¶ 20-24).

¶ 53    After the parties filed their briefs in this case, however, our supreme court decided *People v. Reyes*, 2016 IL 119271, which directly impacts our decision in this case. In *Reyes*, our supreme court explicitly held that a *de facto* life sentence for a juvenile violates the eighth amendment of the United States Constitution. In that case, a juvenile defendant was convicted of first degree murder and two counts of attempted murder and sentenced to a mandatory minimum term of 97 years' imprisonment. *Reyes*, 2016 IL 119271, ¶ 2. On appeal, the defendant argued that as per the rationale in *Miller*, his sentence violated the eighth amendment prohibition against mandatory life sentences for juvenile murder defendants. *Reyes*, 2016 IL 119271, ¶ 2. The appellate court rejected the defendant's argument and refused to extend *Miller* beyond actual life sentences to *de facto* life terms. *Reyes*, 2016 IL 119271, ¶ 6.

¶ 54    Our supreme court disagreed and reversed the appellate court's decision, holding that a "mandatory term of years that is the functional equivalent of life without the possibility of parole constitutes cruel and unusual punishment in violation of the eighth amendment." *Reyes*, 2016 IL 119271, ¶ 9. As our supreme court explained:

"A mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation the juvenile will die in prison. *Miller* makes clear that a juvenile may not be sentenced to a mandatory, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation." *Reyes*, 2016 IL 119271, ¶ 9.

¶ 55    In addition our supreme court held:

" '[T]he teachings of the *Roper/Graham/Miller* trilogy require sentencing courts to provide an individualized sentencing hearing to weigh the factors for determining a juvenile's "diminished culpability and greater prospects for reform" when, as here, the aggregate sentences result in the functional equivalent of life without parole. To do otherwise would be to ignore the reality that lengthy aggregate sentences have the effect of mandating that a juvenile "die in prison even if a judge or jury would have thought that his youth and its attendant characteristics, along with the nature of his crime, made a lesser sentence (for example, life with the possibility of parole) more appropriate." [Citation.] Such a lengthy sentence " 'means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the juvenile convict], he will remain in prison for the rest of his days.' " [Citation.] That is exactly the result that *Miller* held was unconstitutional.' [Citation.]" (Emphasis omitted.) *Reyes*, 2016 IL

119271, ¶ 9 (quoting *Bear Cloud v. State*, 2014 WY 113, ¶ 33, 334 P.3d 132 (Wyo. 2014)).

¶ 56 Accordingly, under the holding in *Reyes*, if we were to find that the petitioner's 50-year sentence constitutes a *de facto* life sentence, we would be compelled to conclude that such a sentence, without consideration of the factors unique to juveniles, is unconstitutional as applied to him under the eighth amendment.

¶ 57 While our supreme court in *Reyes* extended *Miller* to *de facto* life sentences because they "cannot be served in one lifetime" it left open the question of what age constitutes a "lifetime" and who gets to make that determination. Various panels of our appellate court appear to be split on this issue and further disagree as to whether it is even appropriate for a court of review to reflect on questions of biology and statistics. See *People v. Harris*, 2016 IL App (1st) 141744, ¶ 52; see also *People v. Jackson*, 2016 IL App (1st) 143025, ¶ 57 (recognizing that appellate courts "need a consistent and uniform policy on what constitutes a *de facto* life sentence"). As the court in *Jackson*, 2016 IL App (1st) 143025, ¶ 57, aptly pointed out:

> "Is it simply a certain age upon release? If so, is it age 65 *** or 90? Should the age vary by ethnicity, race or gender? If we are going to consider more than age, what societal factors or health concerns should impact our assessment of a *de facto* life sentence. These are policy considerations that are better handled in a different forum."

¶ 58 While we recognize the dilemma in grappling with such complex questions, contrary to the State's position, we do not see how justice is better served by avoiding them. In *Gipson*, the appellate court did wrestle with these issues, noting that in "determining whether a particular term of years is a natural life sentence in disguise," the court was required to "consider whether the defendant may be released from prison in his lifetime." *Gipson*, 2015 IL App (1st) 122451, ¶ 66. In doing so, the court in *Gipson* considered, *inter alia*, the potential credit available to the defendant, the defendant's projected parole date as indicated on the Illinois Department of Corrections (IDOC) website, and the defendant's own alleged life expectancy. *Gipson*, 2015 IL App (1st) 122451, ¶ 66.

¶ 59 Subsequently, in dealing with the same issue in *People v. Sanders*, 2016 IL App (1st) 121732-B, ¶ 26, the appellate court relied on the United States Sentencing Commission Preliminary Quarterly Data Report, indicating that "a person held in a general prison population has a life expectancy of about 64 years" and that this estimate "probably overstates the average life expectancy for minors committed to prison for lengthy terms." *Sanders*, 2016 IL App (1st) 121732-B, ¶ 26. As the court in *Sanders* explained:

> " 'A person suffers a two-year decline in life expectancy for every year locked away in prison. *Evelyn J. Patterson, The Dose-Response of Time Served in Prison on Mortality: New York State*, 1989-2003, 103 Am. J. of Pub. Health 523, 526 (2013). The high levels of violence and communicable diseases, poor diets, and shoddy health care all contribute to a significant reduction in life expectancy behind bars. See *United States v. Taveras*, 436 F. Supp. 2d 493, 500 (E.D.N.Y. 2006) (finding "persistent problems in United States penitentiaries of prisoner rape, gang violence, the use of excessive force by officers, [and] contagious diseases" that lead to a lower life expectancy in prisons in the United States), aff'd in part, vacated in part sub nom. *United States v. Pepin*, 514 F.3d 193 (2d Cir. 2008); John J. Gibbons & Nicholas de B. Katzenbach, *Confronting Confinement* 11 (2006). Entering prison at a young age is particularly dangerous. Youth incarcerated in adult prisons are five times more likely to

be victims of sexual or physical assault than are adults. [Citation]; Deborah LaBelle, Michigan Life Expectancy Data for Youth Serving Natural Life Sentences, http: //fairsentencingofyouth.org/wp-content/uploads/2010/02/Michigan-Life-Expectancy-Data-Youth-Serving-Life.pdf (last visited Dec. 12, 2013).' [Citation.]" *Sanders*, 2016 IL App (1st) 121732-B, *¶* 26 (quoting Nick Straley, *Miller's Promise: Re-Evaluating Extreme Criminal Sentences for Children*, 89 Wash. L. Rev. 963, 986 n.142 (2014)).

¶ 60    Most recently, the appellate court in *Harris*, 2016 IL App (1st) 141744, ¶¶ 53-54, agreed with *Sanders*, noting that the lower life expectancy of minors committed to prison for lengthy terms was "not surprising given the harshness of a lifetime spent in a state penitentiary."

¶ 61    With these principles in mind, we further note that while our supreme court has not yet attempted to delineate what constitutes a lifetime,[1] in finding *de facto* life sentences unconstitutional, it relied heavily on the reasoning of the Wyoming Supreme Court in *Bear Cloud v. State*, 2014 WY 113, ¶ 33, 334 P.3d 132 (Wyo. 2014). That decision explicitly found that an aggregate 45-year sentence imposed on a 16-year-old triggered the eighth amendment's prohibition against mandatory life sentences. See *Bear Cloud*, 2014 WY 113, ¶¶ 31-37.

¶ 62    Under these circumstances, we conclude that the petitioner's 50-year sentence is a *de facto* life sentence. The petitioner was born on March 17, 1993. He was placed into custody on May 12, 2009. According to the IDOC website, of which we may take judicial notice (see *People v. Sanchez*, 404 Ill. App. 3d 15, 17 (2010) (finding that this court can take judicial notice of the IDOC website)), the petitioner's projected parole date is May 12, 2059, at which point he will be 66 years old. The petitioner's projected discharge date is May 12, 2062, at which point he will be 69. Accordingly, as a practical matter, the petitioner, whose average life expectancy is at best 64 years, will not have a meaningful opportunity for release. See *Reyes*, 2016 IL 119271, ¶¶ 9-10 ("a mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole"); see also *State v. Null*, 836 N.W.2d 41, 71 (Iowa 2013) ("[W]hile a minimum of 52.5 years imprisonment is not technically a life-without-parole sentence, such a lengthy sentence imposed on a juvenile is sufficient to trigger *Miller*-type protections. Even if lesser sentences than life without parole might be less problematic, we do not regard the juvenile's potential future release in his or her late sixties after a half century of incarceration sufficient to escape the rationales of *Graham* or *Miller*. The prospect of geriatric release, if one is to be afforded the opportunity for release at all, does not provide a 'meaningful opportunity' to demonstrate the 'maturity and rehabilitation' required to obtain release and reenter society as required by *Graham*, 560 U.S. at [75], 130 S. Ct. at 2030 ***."); see also *Bear Cloud*, 2014 WY 113, ¶ 33, 334 P.3d 132 (holding that aggregate 45-year sentence was unconstitutional under *Miller* because "[s]uch a lengthy sentence means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the juvenile convict], he will remain in prison for the rest of his days" (internal quotation marks omitted)).

¶ 63    In coming to this decision, we reject the State's contention that the trial court already had the opportunity to consider all the mitigating evidence in favor of the petitioner, including his

[1]We note that in *Reyes*, the court did not have to grapple with the concerns facing us here because the State conceded that the sentence imposed (97 years, of which the defendant had to serve at least 89) was a lifetime sentence. See *Reyes*, 2016 IL 119271, ¶ 10.

youth, and nonetheless sentenced him to a term of 50 years' imprisonment. The record before us reveals that although the trial court exercised discretion in imposing the petitioner's sentence, nothing in the record supports the State's position that the court's reasoning comported with the juvenile sentencing factors recited in *Roper*, *Graham*, *Miller*, and *Montgomery*. Those decisions unequivocally require that before sentencing a juvenile to life without parole, the judge take into account " 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' " *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 733 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469). Specifically, those cases require that the sentencing court take into account (1) a child's diminished culpability and heightened capacity for change; (2) the fact that children are immature, irresponsible, reckless, impulsive, and vulnerable to negative influences; and (3) that they lack control over their environment and the ability to extricate themselves from crime-producing circumstances. See *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 733; *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464.

¶ 64    We therefore conclude that under our supreme court's decision in *Reyes*, the petitioner's sentence was an unconstitutional mandatory *de facto* life sentence. In light of this determination we need not decide whether his sentence was also unconstitutional under the Illinois proportionate penalties clause. Ill. Const. 1970, art. I, § 11.

¶ 65    The parties next disagree as to the proper remedy. The State urges us to decline the petitioner's request to remand for a new sentencing hearing and instead only remand to circuit court for the second stage of postconviction proceedings.

¶ 66    While we recognize the relief following a first-stage dismissal under the Act ordinarily involves remand for second stage proceedings, we believe that both judicial economy and the particular issue raised in this appeal (namely the unconstitutionality of the petitioner's sentence under *Reyes*) require us to vacate the petitioner's sentence and remand for resentencing. See *Nieto*, 2016 IL App (1st) 121604, ¶ 57 (remanding for a new sentencing hearing on appeal from the dismissal of a postconviction petition raising the unconstitutionality of the juvenile defendant's sentence); see also *People v. Davis*, 2014 IL 115595, ¶¶ 1, 43 (remanding for a new sentencing hearing on appeal from the denial of leave to file a successive petition).

¶ 67    Although disputed in the briefs, at oral argument, the State conceded that if we choose to remand the cause for a new sentencing hearing, pursuant to *Reyes*, the petitioner is entitled to elect to be resentenced under section 5-4.5-105 of the Unified Code of Corrections (Code) (Pub. Act 99-69 (eff. Jan. 1, 2016) (adding 730 ILCS 5/5-4.5-105)). This recently enacted statute requires that in determining the appropriate sentence for those offenders who committed the offense when they were under 18, the sentencing judge take into account, along with the factors in aggravation, numerous factors in mitigation particular to youth (and first articulated under *Roper*, *Miller*, and *Graham*), such as, *inter alia*, age, impetuosity, level of maturity, ability to consider risks and consequences of behavior, whether the juvenile was subjected to outside pressure or negative influences, and the potential for rehabilitation. 730 ILCS 5/5-4.5-105 (West Supp. 2015). In addition, the statute gives the trial judge discretion to decide whether or not to impose the previously mandatory firearm enhancements. See *id.*

¶ 68    In *Reyes*, after vacating the defendant's *de facto* life sentence as unconstitutional under the eighth amendment, our supreme court held, albeit with agreement of the parties, that pursuant to section 4 of the Statute on Statutes (5 ILCS 70/4 (West 2014)), the defendant was entitled on

remand to be resentenced under the new sentencing scheme found in section 5-4.5-105 of the Code (730 ILCS 5/5-4.5-105 (West Supp. 2015)), even though that sentencing statute had not become law until the parties had already filed their briefs in the case. See *Reyes*, 2016 IL 119271, ¶ 12 ("section 4 of the Statute on Statutes entitles a defendant 'to be sentenced under either the law in effect at the time the offense was committed or that [was] in effect at the time of sentencing' " (quoting *People v. Hollins*, 51 Ill. 2d 68, 71 (1972))). In doing so, the court in *Reyes* found relevant that on remand the trial court would have the discretion not to apply the firearm enhancement to the defendant's sentence, thereby resulting in the mandatory minimum aggregate being reduced to a term that would not constitute a *de facto* life sentence (namely 32 years). Accordingly, our supreme court held that "[b]ecause defendant would not be subject to a mandatory, life-without parole sentence under section 5-4.5-105," the cause should be remanded to the trial court with direction that the new sentencing hearing be held in accordance with that statute.

¶ 69 In the present case, once we vacate the petitioner's sentence, on remand, the new sentencing hearing will take place after the effective date of the current sentencing statute, avoiding any retroactivity concerns. Section 4 of the Statute on Statutes explicitly states that "[i]f any penalty, forfeiture or punishment be mitigated by any provision of a new law, such provisions may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect." 5 ILCS 70/4 (West 2014). The new sentencing procedure (including the consideration of youth-specific factors and the trial court's ability to forgo any firearm enhancement) certainly mitigates the prior sentencing scheme, and the petitioner undeniably consents to the trial court using this new procedure, once we pronounce the judgment in this case. Accordingly, under these circumstances and pursuant to the rationale in *Reyes*, we find that on remand the petitioner should be resentenced in accordance with section 5-4.5-105 of the Code (730 ILCS 5/5-4.5-105 (West Supp. 2015)). See *Reyes*, 2016 IL 119271, ¶ 12; *Hollins*, 51 Ill. 2d at 71 (holding that section 4 of the Statute on Statutes entitles a defendant "to be sentenced under either the law in effect at the time the offense was committed or that [is] in effect at the time of sentencing").

¶ 70 To be clear, in doing so, we neither condone the petitioner's actions nor make any representation as to what sentence the trial court, in its discretion, should impose. As the State observed at oral argument, the petitioner in this instance repeatedly bragged to his fellow gang members about committing the crime, which resulted in the death of an innocent woman. A trial court following *Miller*, however, could find that this fact was either consistent with the petitioner's youth or consistent with the deliberate nature of the crime. Nonetheless, under the eighth amendment, the process itself matters.[2]

---

[2]We note that despite the "feel-good" decision in *Reyes* and the new legislation regarding juveniles in the criminal justice system, it is our view that the legislature has not taken sufficient steps to achieve any real rehabilitation of those juveniles tried in adult criminal court. A juvenile (with or without gang affiliation) placed in an adult prison system will quite likely be forced to join a gang inside that prison system in order to survive. If, instead of cutting all the programs that could aid in rehabilitation, the legislature were to require that all juveniles serving adult sentences in adult prison were separated from adult inmates (and placed into mandatory education and/or work-training programs) and were further to impose a mandatory judicial review of a juvenile's sentence for future consideration of parole after half of that sentence has been served, we believe that this would incentivize good behavior and better serve

- 14 -

¶ 71                        III. CONCLUSION

¶ 72    For the foregoing reasons, the judgment of the circuit court is reversed, and the cause is remanded for resentencing in accordance with section 5-4.5-105 of the Code (730 ILCS 5/5-4.5-105 (West Supp. 2015)).

¶ 73    Reversed and remanded.

¶ 74    JUSTICE PUCINSKI, specially concurring.

¶ 75    While I agree with the majority on the result of this case, I would address Buffer's argument that the truth-in-sentencing statute (commonly referred to as the Truth in Sentencing Act (730 ILCS 5/3-6-3(a)(2)(i) (West 2006))) by its nature eliminates the opportunity to achieve parole and that for that reason alone the Truth in Sentencing Act as it applies to juvenile offenders is unconstitutional. I have been concerned for some time that not enough attention is given to this matter. See *People v. Taylor*, 2015 IL App (1st) 121577-U, ¶ 81 (Mason, P.J., and Lavin, J., specially concurring "in the judgment only" to order authored by Pucinski, J.).

¶ 76    On appeal, juvenile offenders generally rely on two statutes, automatic transfer and mandatory sentences, when challenging an adult sentence as a *de facto* life sentence.

¶ 77    But the United States Supreme Court has been very clear that a sentence of life *without the possibility of parole* is what has really driven the *Miller*, *Roper*, and *Graham* trilogy.

¶ 78    Since I wrote *Taylor*, my opinion about the Truth in Sentencing Act related to juveniles has not changed, and I am not the least concerned about repeating myself.

¶ 79    As I stated, "taken as it is written, the Truth in Sentencing Act is a stand-alone act that should be considered separately for its constitutionality as applied to juvenile offenders such as defendant here." *Taylor*, 2015 IL App (1st) 121577-U, ¶ 45.

¶ 80    When a juvenile offender is tried as an adult and convicted and sentenced as an adult for murder in the first degree, the Truth in Sentencing Act requires the juvenile offender to serve 100% of this sentence. *Id.* ¶ 46.

> "This is not part of the sentencing scheme; it is part of the state's criminal procedure as a mandate to and for the authority of the Department of Corrections.
>
> It is not a sentencing statute because it does not rely on any judge, or any court, to impose or administer it. ' "Sentence" is the disposition imposed by the court on a convicted defendant.' 730 ILCS 5/5-1-19 (West 2006).
>
> It is a corrections statute because only the Department of Corrections can administer it: 'The Department of Corrections shall prescribe rules and regulations for awarding and revoking sentence credit for persons committed to the Department *** a prisoner who is serving a term of imprisonment for first degree murder *** shall receive no sentence credit and shall serve the entire sentence imposed by the court.' 730 ILCS 5/3-6-3(a)(2)(i) (West 2006)[ ].
>
> We recognize that in the Rubik's cube of decision-making, a sentencing judge will, and indeed must, consider all the moving parts: the crime, the class of crime, the

the purposes of rehabilitation and reinstatement into society. See Ron Berler, *Illinois Parolees: Often Undereducated, Unemployed—And Soon Back Behind Bars*, Chi. Trib., Mar. 20, 2017, § 1, at 15.

aggravating and mitigating factors, the legally possible sentencing range, any enhancements, any exceptions, mandatory sentencing, and what impact the Truth in Sentencing Act will have. But, that is not to say that the Truth in Sentencing Act only exists as an extension of the other sentencing factors. It has a life of its own; if it were repealed tomorrow, the rest of the sentencing statutes would still exist. It is that separate life of the Truth in Sentencing Act that is troubling where it intersects the sentencing of juvenile offenders.

One of the required filters in sentencing juveniles is, and must be, their potential for rehabilitation. It is a different prism than the potential of adult defendants for rehabilitation. The United States Supreme Court and the Illinois Supreme Court have acknowledged what every parent and every civilized society knows: children are different from adults. They have a larger and potentially unlimited ability to change as they mature, and those changes can be for the better, or unfortunately, for the worse, depending in large part on their own history when dropped into the surroundings and experiences of prison.

Indeed, the Unified Code of Corrections defines, as one of the powers and duties of the Department of Corrections, the responsibility 'to accept persons committed to it by the courts of this State for care, custody, treatment *and rehabilitation…*' (Emphasis added.) 730 ILCS 5/3-2-2(1)(a) (West [Supp. 2015]).

*** [R]ehabilitation is firmly rooted in our legal history. This duty and the responsibility for rehabilitation first appeared in 1973 (Ill. Rev. Stat. 1973, [ch. 38, ¶ 1003-2-2]). Before that, beginning in 1869, the Commissioners of the Penitentiary were directed to provide 'diminution of sentence if no infractions of the discipline' occurred with reductions in sentence for good conduct. The prisoner would then get a certificate of 'restoration' [(1869 Ill. Laws 81 (§ 2))]. By 1880, the Commissioners were required to develop rules that 'shall best conduce to the reformation of convicts' (Ill. Rev. Stat. 1880, [ch. 108, ¶ 10]) and to provide for 'good time' for convicts who followed the rules (Ill. Rev. Stat. 1880, [ch. 108, ¶ 45]).

'When defining crimes and their penalties, the legislature must "consider the constitutional goals of restoring an offender to useful citizenship and of providing a penalty according to the seriousness of the offense.["] ' *People v. Leon Miller*, 202 Ill. 2d 328, 338 (2002) (quoting *People v. Taylor*, 102 Ill. 2d 201, 206 (1984)).

In *People v. Roper*, 543 U.S. 551 (2005)[,] the U.S. Supreme Court in deciding that the death penalty for juvenile offenders is unconstitutional stated: 'The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, "the relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." ' *Roper*[, 543 U.S. at 570 (quoting *Johnson v. Texas*, 509 U.S. 350, 368 (1993))].

*Roper* continues: 'It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient

immaturity and the rare juvenile offender whose crime reflects irreparable corruption. As we understand it, this difficulty underlies the rule forbidding psychiatrists from diagnosing any patient under 18 as having antisocial personality disorder, a disorder also referred to as psychopathy or sociopathy, and which is characterized by callousness, cynicism and contempt for the feelings, rights and suffering of others. If trained psychiatrists with the advantage of clinical testing and observation refrain, despite diagnostic expertise, from assessing any juvenile under 18 as having antisocial personality disorder, we conclude that States should refrain from asking jurors to issue a far graver condemnation—that a juvenile offender merits the death penalty. When a juvenile offender commits a heinous crime, the State can exact forfeiture of some of the most basic liberties, but the State cannot extinguish his life and his potential to attain a mature understanding of his own humanity.' (Internal [quotation marks] omitted.) *Roper*[, 543 U.S. at 573-74].

While *Roper* was a death penalty case, and this case is not, the underlying reasoning—that most juveniles are capable of rehabilitation, that it is impossible at sentencing to predict which ones can be rehabilitated and to what degree, and that the state must provide a meaningful opportunity for juvenile defendants to demonstrate their rehabilitation at some point along the line—points in the direction of finding that the Truth in Sentencing Act, as it applies to juveniles denies them the fundamental right to demonstrate rehabilitation.

The U.S. Supreme Court expanded its analysis of juvenile offenders in *Graham v. Florida*, 560 [U.S.] 48 (2010), a life without parole case involving a non-homicide crime. 'Life without parole is an especially harsh punishment for a juvenile. Under this sentence a juvenile offender will on average serve more years and a greater percentage of his life in prison [than] an adult offender. A 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only. [Citation.] This reality cannot be ignored.' *Graham*[, 560 U.S. at 70]. The Court stated: '*** life without parole *** alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration ***. *** [T]his sentence 'means denial of hope, it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit [of the convict], he will remain in prison for the rest of his days.' *Graham*[, 560 U.S. at 69-70 (quoting *Naovarath v. State*, 779 P.2d 944 (Nev. 1989))].

The *Graham* court reviewed retribution, deterrence, incapacitation and rehabilitation. Regarding incapacitation the court reasoned: 'By denying the defendant the right to reenter the community the State makes an irrevocable judgment about that person's value and place in society. This judgment is not appropriate in light of juvenile nonhomicide offender's capacity for change and limited moral culpability. A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. *** The Eighth Amendment *** does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society.' *Graham*[, 560 U.S. at 75].

Acknowledging that *Graham* concerned a nonhomicide offense, and Taylor was convicted of first degree murder does not alter the analysis: that it is impossible for any system to determine at the outset that a juvenile offender is totally irredeemable and can never be rehabilitated. The Truth in Sentencing Act as it applies to juvenile offenders does exactly that. It deprives the juvenile homicide offender any opportunity to demonstrate rehabilitation. That ignores the reality that juveniles by definition are immature and moving toward maturity. Granted, some juveniles will not be able to demonstrate maturity and rehabilitation. It is the deprivation of the chance to demonstrate fundamental change in his nature that offends our view of juveniles and justice in the same context.

Finally, the *Miller* court considered whether a sentence of life without parole for a juvenile convicted of murder was unconstitutional, and found that it violated the Eighth Amendment's prohibition against cruel and unusual punishments.

'Most fundamentally, *Graham* insists that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole, "An offender's age," we make clear in *Graham*, "is relevant to the Eighth Amendment," and so "criminal procedure laws that fail to take defendant's youthfulness into account at all would be flawed.[" '] *Miller*, 567 U.S. at ___, 132 S. Ct. at 2466 (quoting *Graham*, 560 U.S. at 75)].

The *Miller* court went on to analyze what it called the 'confluence' of state laws and reasoned that it was the impact of several laws acting together that caused concern because it was impossible to tell if the states 'actually "intended to subject such offenders to those sentences" ' or if it was just the fact that statutes in combination had the effect of life without parole for juvenile offenders. See *Miller*[, 567 U.S. at ___, 132 S. Ct. at 2473].

The Illinois Truth in Sentencing Act is a good candidate for the same reasoning: did the Illinois legislature actually intend for juveniles who are[ ] 1) transferred automatically to adult court by the charging decision of the state's attorney, with no requirement for any protocol or reason, and with no judicial review; and are then 2) subject to adult sentences, including adult enhancements; to then be 3) subject to the truth in sentencing provisions that require (for a murder conviction) they must serve 100% of their sentence with no possibility of demonstrating maturity or rehabilitation? Or was the effect of the Truth in Sentencing Act just an unintended consequence of the transfer to adult court without its own specific legislative decision making?

An analysis of the General Assemblies from the 87th (1991-1992) through the 96th (2009-2010) for relevant topics reveals that the Truth in Sentencing Act was one part of the legislature's response to a severe uptick in violent crime in the early l990's. The Congress of the United States responded with the [Violent Crime Control and Law Enforcement Act of 1994 (42 U.S.C. § 13701 (1994))]. Among other things the bill provided federal incentive money for states that adopted truth in sentencing laws in which violent offenders must serve at least 85% of their sentence. Congress dangled $3.95 billion for 1996 to 2000 in front of states that passed truth in sentencing laws. It is worth noting that former president Bill Clinton recently renounced his 1994 crime bill: 'The problem is the way it was written and implemented, we have too wide a net….We have too many people in prison. And we wound up spending—putting so many people

in prison that there wasn't enough money left to educate them, train the[m] for new jobs and increase the chances when they came out that they could live productive lives.' [http://thehill.com/blogs/blog-briefing-room-news/241247-bill-clinton-renounces-his-1994-crime-bill] (May 6, 2015). In a later CNN interview, the former president said: 'In that bill there were longer sentences. And most of these people are in prison under state law, but the federal law set a trend…And that was overdone. We were wrong about that.' http://www.cnn.come/2015/07/15/politics/bill-clinton-1994-crime-bill/ (July 15, 2015).

States, including Illinois, wanting to be 'tough on crime' and in search of those federal dollars responded with tougher sentences, mandatory sentences, enhanced sentences, automatic transfer of juveniles to adult court for certain crimes, and the Truth in Sentencing Act.

During the debates on the various bills in the House and the Senate, the Illinois Legislature did not debate the behavioral, psychological or social characteristics of juveniles. This is not surprising since the scientific research in this area is relatively new.

And, it is clear that the legislature did not, during this time period, ever consider the result of the confluence of these tough on crime measures on juveniles. It is this intersection that is most troubling because it is when truth in sentencing is meshed with mandatory sentences and mandatory transfer to adult court that the consequences are most apparent. And those are the very same consequences on juveniles that were never specifically detailed, debated or considered when the Legislature was considering these bills.

To her credit, Rep. Barbara Flynn [Currie], in a related debate on December 1, 1994, said: 'We need to find out whether we are on the right track in dealing with serious crimes committed by juveniles….we've tried, get tough. I think it's time for us to get smart…' [(88th Ill. Gen. Assem., House Proceedings, Dec. 1, 1994, at 72)].

There are other members of the Legislature that were consistent in their instinct that the tough measures being debated and passed were not necessarily the answer for juvenile crime.

More persuasive to their colleagues were those who argued for the various bills. Rep. Rosemary Mulligan, in House debates on April 7, 1995 said: 'Rehabilitation is a good thing, but I think we all realize that by the time a young person has committed a crime we may have passed the point where we can rehabilitate them ….' [(89th Ill. Gen. Assem., House Proceedings, Apr. 7, 1995, at 173)]." *Taylor*, 2015 IL App (1st) 121577-U, ¶¶ 47-71.

¶ 81 When the Truth in Sentencing Act was debated

"[t]here was no debate on the Truth in Sentencing Act that focused specifically on its impact on juveniles transferred to adult court who were then subject to mandatory sentence, or for that matter on juveniles at all. The Truth in Sentencing Act [as part of Pub. Act 89-404] became effective August 20, 1995. It was later struck down by the Appellate Court as unconstitutional because the full bill violated the single subject rule in *People v. Pitts*, 295 Ill. App. 3d 182 (1998)[.] [S]ee also *People v. Reedy*, 295 Ill. App. 3d 34 (1998)[;] *People v. Reedy*, 186 Ill. [2d] 1 (1999).

In 1998 the Illinois Legislature re-enacted the provisions of the Truth in Sentencing Act [Pub. Act 90-592] again, curing the constitutional problem, but with no specific debate on its impact on juvenile offenders who were transferred to adult court and then subject to mandatory sentences.

One example of the lack of attention to the ramifications of the intersection of these tough on crime bills appears [in the] debate to add certain sexual offenses to the truth in sentencing provisions. Rep. Hoffman asked: 'What about juveniles? Does this apply to any juvenile crimes?' and Rep. Righter responded: 'Only if they are tried and convicted as adults, it's my understanding.' [91st Ill. Gen. Assem., House Proceedings, Mar. 9, 1999, at 6]. Those three sentences can hardly qualify as robust debate. The measure passed without any more discussion.

However, even if the legislature had at some point in the past engaged in debate on the specific issue of whether juveniles tried as adults should be subject to the Truth in Sentencing Act, what we know now about juvenile development should require a new analysis by the legislature." *Id.* ¶¶ 72-75.

¶ 82 In particular, I believe "the specific truth in sentencing provision to which defendant was subjected (730 ILCS 5/3-6-3(a)(2)(i) ([West] 2006)), which precludes defendant from any possibility of early release, to be particularly vexing because defendant cannot, under any circumstance, demonstrate his potential for rehabilitation at any time prior to the completion of his sentence." *Id.* ¶ 76.

¶ 83 I urge the legislature to reconsider the Truth in Sentencing Act as it applies to juvenile offenders.