# Illinois Official Reports

## Appellate Court

---

### *People v. Joiner*, 2018 IL App (1st) 150343

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTUAN JOINER, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-15-0343 |
| Filed | March 30, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-13176; the Hon. Vincent M. Gaughan, Judge, presiding. |
| Judgment | Affirmed in part, vacated in part, and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Michael H. Orenstein, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Dylan Rakestraw, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE REYES delivered the judgment of the court, with opinion.<br>Justices Lampkin and Rochford concurred in the judgment and opinion. |

**OPINION**

¶ 1    After a bench trial, 16-year-old defendant Antuan Joiner was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) and two counts of attempted murder (720 ILCS 5/8-4(a) (West 2012)) and was sentenced to 71 years' imprisonment in the Illinois Department of Corrections. On appeal, defendant contends his trial counsel provided ineffective assistance by failing to move to suppress suggestive photo array and lineup identifications. Defendant also contends that the State failed to prove beyond a reasonable doubt that he was the perpetrator of the offense and that his due process rights were violated when the trial court improperly shifted the burden of proof. Defendant further maintains that his sentence is unconstitutional under *Miller v. Alabama*, 567 U.S. 460 (2012), and that the new juvenile sentencing provisions, making firearm enhancements discretionary, apply retroactively, requiring this matter to be remanded for resentencing. For the reasons that follow, we affirm the judgment of the circuit court finding defendant guilty of murder and attempted murder, but remand the matter for resentencing.

¶ 2                                    BACKGROUND

¶ 3    Defendant was charged by indictment in pertinent part with the first degree murder of Shakaki Asphy (Asphy) and the attempted murders of Leon and Thomas Cunningham. The indictment alleged that on June 16, 2012, defendant personally discharged a firearm in the direction of the victims and that defendant's actions caused the death of Asphy as well as serious injury to Leon. Defendant, who was 16 years old at the time of the offense, was prosecuted as an adult (see 705 ILCS 405/5-130(1)(a)(i) (West 2012)). The matter then proceeded to a bench trial.

¶ 4    Leon Cunningham testified as follows. On June 16, 2012, he was 18 years old and a member of the Gangster Disciples, "70th Set" (a faction within the Gangster Disciples street gang). He was also bound to a wheelchair because he is paralyzed from the waist down. At 7 p.m., he was socializing with friends, including Thomas and Asphy, outside an abandoned building on the 2000 block of West 70th Place when he observed a gray vehicle drive past. Leon testified that he observed defendant, who he knew by the nickname "Monkey Man," inside the vehicle. Leon explained that while he did not know defendant personally, he had seen him around the neighborhood and was aware defendant was a member of the "D-Block" faction of the Gangster Disciples. According to Leon, when the vehicle drove past, he felt something was "wrong," but nevertheless remained outside the house.

¶ 5    Shortly thereafter, everyone except Leon, Thomas, and Asphy left. Leon was in his wheelchair at the base of the porch stairs, Thomas was standing at the top of the stairs, and Asphy was perched on the porch railing near the top of the stairs. Suddenly, Leon observed a man wearing a black hooded sweatshirt, with the hood drawn over his head, appear in the east-side gangway of the abandoned building, holding a firearm. Leon identified this individual as defendant, who he continued to refer to by his nickname, "Monkey Man." Leon testified he was 10 or 15 feet away from defendant when defendant began shooting. Leon further testified that he had a clear view of the weapon, which he identified as a semiautomatic "9" with an "extended clip." As defendant fired his weapon, Thomas ran from the porch. With nowhere to go, Leon remained at the base of the porch.

¶ 6        After the shooting ceased, Leon observed defendant run back through the gangway. Leon noticed Asphy lying on the porch and wheeled himself over toward his own home next door to seek assistance, but remained outside on the sidewalk. Shortly thereafter he recognized that he was bleeding, having been shot in the left knee. Paramedics and police officers arrived and removed both Leon and Asphy in separate ambulances to Christ Hospital. Leon testified that when he was at the hospital, he informed the police officers that "Monkey Man" shot him, but did not provide them with a physical description of the perpetrator.

¶ 7        Leon further testified that, the following day, a detective visited him at the hospital and presented him with a photo array. According to Leon, "Monkey Man" was not depicted in the photo array. On June 18, 2012, Leon was presented with a second photo array and identified defendant as the perpetrator of the offense.

¶ 8        On cross-examination, Leon testified that the gray automobile drove past him quickly and did not stop, so he was "guessing" that he observed "Monkey Man" inside the vehicle. He further testified that he was "guessing" that defendant was a member of "D-Block." Leon also testified that there were "problems," *i.e.*, shootings, between the "70th Set" and the "D-Block." Leon testified that he had fought with members of "D-Block," but not with defendant personally.

¶ 9        Leon also testified that he did not inform the responding officers that "Monkey Man" had shot him, but did relay to the paramedics that he observed the shooter. He did not, however, inform the paramedics that "Monkey Man" shot him.

¶ 10       Leon further testified on cross-examination that his brother Thomas visited him at the hospital on June 19, 2012, and they discussed the shooting and their desire to find the perpetrator. Leon was also extensively questioned regarding the color of the hooded sweatshirt, and, even after being impeached with his grand jury testimony, insisted the sweatshirt was black and not gray.

¶ 11       Thomas Cunningham, who was 17 years old at the time of the incident, testified that on June 16, 2012, at 7 p.m., he was sitting on the porch of an abandoned house with Leon and Asphy, celebrating a friend's birthday and smoking marijuana. Leon was in his wheelchair at the base of the stairs. Thomas then observed "Monkey Man" come through the gangway with a gray hood tied around his head.[1] Thomas identified "Monkey Man" as defendant and testified he had known him from the neighborhood "for a while." Defendant was 10 feet away from Thomas and his face was clearly visible, despite the hood being tied around it. At that moment, defendant then started firing his weapon, initially toward Asphy and then at him. Thomas ducked behind the brick porch wall then he jumped off the porch and ran across a vacant lot. When he could no longer hear gunfire, Thomas returned to the abandoned house and discovered Asphy lying on the porch. Thomas was unaware his brother had also been shot and left the scene before his brother was placed in the ambulance.

¶ 12       On the evening of June 18, 2012, police officers came to Thomas's residence and requested he come to the police station to view a lineup. Thomas, accompanied by his mother, viewed a lineup at the police station, where he identified defendant as the individual who had shot at him.

---

[1]When Thomas first references defendant, the trial transcript indicates he said "Money Man came through the gangway." Thereafter, Thomas refers to defendant as "Monkey Man."

¶ 13    On cross-examination, Thomas testified that Leon was also smoking marijuana at the time of the shooting. Thomas further testified that he did not tell the responding officers that defendant shot at him, nor did he go to the police station of his own volition to inform them of the identity of the shooter. Thomas also testified that he went to the hospital to visit his brother on June 18, 2012. Thomas further testified that while he had spoken with Leon prior to identifying defendant in the lineup, they did not discuss the identity of the shooter.

¶ 14    Thomas was also extensively questioned by defense counsel as to how he was acquainted with defendant. Thomas testified that he knew defendant from the neighborhood for "a couple of years," but when pressed to give a precise number, Thomas replied colloquially that, "I known [*sic*] him for a minute. I can't give you no years. I know him from the neighborhood." Thomas further testified that he was not friends with defendant and had never spoken with him. Thomas also testified that he was surprised that defendant would "come and shoot" him "[b]ecause I ain't never did nothing to [the] dude [*sic*]."

¶ 15    Cornelius Byther (Byther) testified that at 7 p.m. on June 16, 2012, he was washing his vehicle in the alley in the 7100 block of South Damen Avenue when he heard some "pops" coming from the north. Minutes later, in the corner of his eye, he noticed two young men running south in the alley toward him. He could not recall what they were wearing and did not observe their faces. He did, however, see them climb over a garbage can and jump over a fence to an abandoned house. Shortly thereafter the police arrived and Byther informed them of what he had observed.

¶ 16    Officer Lester Vaughan (Vaughan) of the Chicago Police Department testified that on June 16, 2012, he responded to a call of shots fired in the area of 70th Place and Damen Avenue. Vaughan and his partner, Marshaun Wright (Wright), responded instead to the area of West 71st Street and South Seeley Avenue based on their knowledge of a gang feud between "D-Block" and the "70th Set." Specifically, Vaughan went to an abandoned building on the 7100 block of South Seeley Avenue, which was used by "D-Block" members. Approaching the house from the rear, Vaughan observed an open basement door and a black baseball cap on the stairs going down to the basement. Vaughn and Wright proceeded into the basement to look for an offender. In doing so, he observed a gray hooded sweatshirt on the floor with a 9-millimeter handgun on top of it, and he noticed a loaded magazine "not too far from where the weapon was." He secured the area and called for an evidence technician. Photographs taken by the evidence technician were admitted into evidence which depicted the back of the abandoned house spray painted with "D-Block" graffiti. Also admitted into evidence were photographs of the black baseball cap on the steps, the gray hooded sweatshirt with a handgun on top, and the magazine with bullets on a nearby window sill.

¶ 17    The following day, Vaughan was assigned to look for defendant. He went to defendant's residence and spoke with defendant's mother, after which he and Wright located defendant and placed him into custody.

¶ 18    On cross-examination, Vaughan testified that he was inside the abandoned house on Seeley Avenue five minutes after he was notified of the shooting. Vaughan further testified that defendant resided in the 1300 block of West 77th Street and was arrested without incident.

¶ 19    Officer Steve Swain (Swain), an evidence technician with the Chicago Police Department, testified that he received an assignment on June 16, 2012, at 7:46 p.m., to process a scene on the 2000 block of West 70th Place. Upon viewing the scene, Swain discovered seven cartridge casings he believed originated from a semiautomatic pistol. These casings were inventoried

and forwarded to the lab for analysis. Swain then relocated to the abandoned house on the 7100 block of South Seeley Avenue, where he photographed the alley and processed a garbage can, which had what appeared to be handprints and footwear marks on top of the lid. Swain also recovered a black baseball hat, a gray sweatshirt, a handgun, and a loaded magazine. These items were then processed and inventoried by Swain. On cross-examination, Swain explained that in processing the handgun, he swabbed areas of the weapon where more DNA would likely exist, such as the handle.

¶ 20    Detective Marc Delfavero (Delfavero) of the Chicago Police Department testified that on June 16, 2012, he received an assignment to investigate a shooting that had occurred. Delfavero went to Christ Hospital with his partner, Detective William Meador (Meador), to locate the victims. Delfavero then spoke with Leon, who was being treated in the emergency room. Leon informed him that "Monkey Man" shot him. Delfavero was unsuccessful in interviewing Asphy, as she was in surgery at that time. Delfavero then proceeded to the scene of the offense where he observed the cartridge casings. Thereafter he traveled to the abandoned house on South Seeley Avenue, where he observed the hat, sweatshirt, handgun, and magazine.

¶ 21    The following day, Delfavero learned that Asphy had succumbed to her wounds. Delfavero then prepared a photo array and returned to Christ Hospital that evening where he met with Leon. Delfavero read Leon the photo spread advisory form, which Leon signed, and presented him with the photo array. Leon, however, did not make an identification from that array. Leon then advised Delfavero that the suspect had "smaller twists braids in his hair and he had also been shot in the area of 71st and Winchester a few months prior to this."

¶ 22    On June 18, 2012, Delfavero and Meador reviewed police reports and then went to Dunbar High School, where they met with a school official. Following a conversation with him, the detectives received a photograph of defendant. The detectives returned to the police station, prepared a new photo array, and returned to Christ Hospital, where they presented it to Leon at 5:20 p.m. After signing the photo spread advisory form, Leon identified defendant's photo as that of "Monkey Man," the individual who shot him and Asphy. Delfavero informed tactical officers of the identification, and subsequently defendant was placed in custody at 7 p.m.

¶ 23    Thereafter, Delfavero picked up Thomas and Thomas's mother at their home and transported them to the police station where Thomas was to view a physical lineup. Prior to viewing the lineup, Thomas was provided and read a lineup advisory form, which he and his mother signed. Upon viewing the lineup, Thomas identified defendant as the shooter.

¶ 24    On cross-examination, Delfavero testified that, after defendant was in custody, a woman (whose name he could not recall) provided him with information that pointed to another suspect. Delfavero, however, determined there was no need to follow up based on that information. Delfavero explained that while this woman voluntarily relayed this information to him, she refused to speak with a state's attorney or provide a statement.

¶ 25    The parties entered into various stipulations, which included fingerprint and deoxyribonucleic acid (DNA) test results regarding defendant and another individual, Matthew Smith. The stipulations established as follows. The gray hooded sweatshirt tested positive for gunshot residue, indicating that it had come in contact with an item that had gunshot residue on it or it had been in the environment of a discharged firearm. The recovered handgun was tested and determined to be the same firearm that fired the cartridge casings recovered from the scene of the shooting. No suitable fingerprints were discovered on the

handgun, the magazine, or the cartridge. However, two fingerprint lifts from the garbage can in the alley were tested, and neither was found to be a match for defendant or Matthew Smith.

¶ 26    The parties also entered into stipulations regarding the DNA analysis of the gray hooded sweatshirt, black baseball hat, and handgun. The DNA analysis revealed that there was a mixture of DNA profiles on these items, but excluded defendant as a potential donor to these mixtures. The parties, however, further stipulated that it is possible to wear an article of clothing or handle a handgun and not leave enough DNA to be detected. Additionally, the stipulation provided that Matthew Smith was excluded as a potential donor to the DNA profile on the sweatshirt, but could not be excluded as a potential donor to the DNA profile on the baseball hat or the handgun. The stipulation further indicated that the chances a random individual would be included in the DNA mixture on the baseball hat is "1 in 6 Black, 1 in 23 White, or 1 in 14 Hispanic unrelated individuals" and the chances a random person would be included in the DNA mixture on the handgun is "1 in 4 Black, 1 in 5 White or 1 in 4 Hispanic individuals."

¶ 27    The State rested, and the defense moved for a directed finding, which was denied. Defendant then presented the testimony of Debra Bartecki (Bartecki), a paramedic with the Chicago Fire Department. Bartecki testified that on June 16, 2012, she responded to the scene on West 70th Place at 7:09 p.m., where she treated Leon. Bartecki inquired where Leon was hurt and how he became injured. Leon informed Bartecki that he had been shot, but that he had a condition where he could not feel his legs. During the seven minute drive to Christ Hospital, Leon did not say who shot him, nor did Bartecki so inquire. In fact, Leon did not provide her with any details about how he came to be shot.

¶ 28    The defense then rested, and the parties presented closing arguments. The State argued that Leon and Thomas were credible witnesses and that it proved all of the elements of the offenses charged. The defense, on the other hand, argued Leon and Thomas were not credible and emphasized that there was no DNA evidence linking defendant to the physical evidence. The defense further argued that the State presented no motive for defendant to commit this offense.

¶ 29    After considering the evidence and hearing closing arguments, the trial court ultimately found defendant guilty of murder and two counts of attempted first degree murder.

¶ 30    Thereafter, defendant presented a motion for a new trial. At the hearing on the motion, defense counsel argued that the trial court improperly shifted the burden of proof onto defendant. The trial court addressed this claim by stating, "Just for clarification, the burden never shifts, the burden of proof never shifted to the defense. If there was any ambiguity, I just want to clarify that." The trial court then denied the motion.

¶ 31    After hearing arguments in aggravation and mitigation, as well as reviewing the presentencing investigation report, the trial court imposed the mandatory minimum sentence of 45 years' imprisonment for the first degree murder conviction. This sentence consisted of the minimum 20-year sentence for murder (see 730 ILCS 5/5-4.5-20(a) (West 2012) (providing a range of 20 to 60 years)), plus a minimum 25-year mandatory firearm enhancement (see 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2012)). The court also sentenced defendant to 26 years' imprisonment for each of the two attempted murder convictions. The 26-year sentences consisted of the minimum 6-year sentence for attempted murder (see 730 ILCS 5/5-4.5-25(a) (West 2012)), plus a 20-year mandatory firearm enhancement (see 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2012)). In addition, the trial court determined that while defendant's sentences for first degree murder and attempted murder would run consecutively, the two

convictions for attempted murder would run concurrently. As a result, defendant was sentenced to a mandatory minimum aggregate sentence of 71 years' imprisonment. Further, in light of the truth-in-sentencing statute (730 ILCS 5/3-6-3 (West 2012)), defendant would be required to serve a minimum of 66 years of the 71-year sentence imposed before he would be eligible for release. Defendant appealed.

¶ 32                                   ANALYSIS

¶ 33        Defendant raises five contentions on appeal that (1) his counsel was ineffective for failing to file a motion to suppress the pretrial identifications of him as the shooter, (2) the State failed to prove beyond a reasonable doubt that he was the perpetrator of the offense, (3) his due process rights were violated when the trial court improperly shifted the burden of proof requiring him to prove his innocence, (4) his sentence is unconstitutional, and (5) the new juvenile sentencing provisions—making firearm enhancements discretionary—apply retroactively, and thus the matter must be remanded for resentencing in accordance with the new statutory guidelines. We address each contention in turn.

¶ 34                        Ineffective Assistance of Counsel

¶ 35        Defendant first argues that his counsel was ineffective for failing to move to suppress the photographic and lineup identification evidence. Defendant maintains that the procedures employed during the identifications were suggestive. Defendant asserts that in the photo array, his was the only image that was depicted on a red background, and he was the only individual whose hair was styled in short braids. Regarding the lineup, defendant contends that it too was improper where he was the only individual included with "dark skin" and short braids. Defendant concludes that because a motion to suppress identification evidence in this instance had merit, defense counsel was ineffective for failing to present one to the trial court.

¶ 36        In response, the State asserts that defendant's trial counsel was not ineffective where a pretrial motion to suppress the identification evidence would have been futile, since the identification procedures were not unduly suggestive. The State further argues that Leon and Thomas were both eyewitnesses to the crime and their identifications were independently reliable. Thus, defendant was not prejudiced where the trial outcome would not have been any different had the evidence been suppressed.

¶ 37        A defendant has a sixth amendment right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. An accused is entitled to capable legal representation at trial. *People v. Wiley*, 165 Ill. 2d 259, 284 (1995). To establish a claim of ineffective assistance of counsel, a defendant must prove both (1) deficient performance by counsel and (2) prejudice to defendant. *People v. Smith*, 195 Ill. 2d 179, 187-88 (2000) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To satisfy the first prong of the *Strickland* test, a defendant must demonstrate his counsel's performance fell below an objective standard of reasonableness, as measured by prevailing norms. *Smith*, 195 Ill. 2d at 188. "To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). To satisfy the second prong, prejudice is demonstrated if there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *People v. Albanese*, 104 Ill. 2d 504, 525 (1984); *People v. Echols*, 382 Ill. App. 3d 309, 312 (2008). The failure to satisfy either the deficiency

prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697; *People v. Peeples*, 205 Ill. 2d 480, 513 (2002).

¶ 38 Where a defendant alleges that counsel was ineffective for failing to file a motion to suppress evidence, the defendant must overcome the "strong presumption" that counsel's decision was the result of sound trial strategy. *People v. Little*, 322 Ill. App. 3d 607, 611 (2001). Additionally, the defendant must demonstrate there was a reasonable probability that the motion would have been granted and the outcome of the proceedings would have been different had the evidence been suppressed. *People v. Patterson*, 217 Ill. 2d 407, 438 (2005). Counsel is not incompetent for failing to file a futile motion to suppress. *Id.*

¶ 39 More specifically, when challenging the propriety of a pretrial identification procedure, the defendant bears the burden of proving that the procedure was unnecessarily suggestive and created a substantial likelihood of misidentification. *People v. Lawson*, 2015 IL App (1st) 120751, ¶ 39. The State may rebut defendant's showing by "clear and convincing evidence that the witness is identifying the defendant based on his or her independent recollection of the incident." *People v. Brooks*, 187 Ill. 2d 91, 126 (1999). Courts look to the totality of the circumstances when reviewing a claim of an unnecessarily suggestive identification. *Lawson*, 2015 IL App (1st) 120751, ¶ 39. Where the challenged identification procedure is a photo array or lineup, individuals selected for the array or lineup need not be physically identical. *People v. Allen*, 376 Ill. App. 3d 511, 521 (2007). A witness's pretrial identification of an accused will not be suppressed unless the identification procedure employed was unnecessarily suggestive and there was a substantial likelihood of irreparable misidentification such that he was denied due process. *People v. Enis*, 163 Ill. 2d 367, 398 (1994).

¶ 40 In this case, defendant challenges the propriety of the photo array and lineup in which he was identified as the perpetrator of the offense.

¶ 41 After examining the copy of the photo array and a photograph of the lineup, which are contained in the record on appeal, and after reviewing the trial testimony, we reject defendant's contention that the identification procedures were unduly suggestive, and we conclude that defense counsel was not ineffective for failing to file a motion to suppress. The photo array contains five color images of young African American men. Defendant has short braids, as does another individual. Among the other young men there is one who has shoulder-length braids, another who has ear-length braids, and one who has unbraided short hair. While defendant's skin tone appears to be darker than the other four individuals, it is not extraordinarily so. See *People v. Faber*, 2012 IL App (1st) 093273, ¶ 57 (lineup participants are not required to be identical or near identical). "It is a truism that individual facial features and hair styles and lengths differ, and this makes precise correspondence of all subjects in a photo array a practical impossibility." *People v. Harrell*, 104 Ill. App. 3d 138, 145 (1982). These differences in appearance did not render the array improper, as arrays depicting more pronounced physical differences between the defendant and the fillers have been found acceptable. See *People v. Kubat*, 94 Ill. 2d 437, 472 (1983) (only the defendant wore glasses); *People v. Smith*, 160 Ill. App. 3d 89, 92 (1987) (only the defendant had blonde hair and was depicted without a shirt); *Harrell*, 104 Ill. App. 3d at 144-45 (defendant had longer hair than the fillers).

¶ 42 Further, although defendant's image is on a red background, we do not find defendant's background was "grossly dissimilar to the others, which had gray backgrounds" as he claims. First, it is disingenuous for defendant to describe the fillers' backgrounds as all being gray. Our

review of the photo array reveals that two backgrounds were light blue (but not the same shade), another background was light-medium blue, and the other background was green-gray. The fact each individual portrayed in the photo array had a different background goes against defendant's argument that the lineup was suggestive. Second, contrary to defendant's claims, this court has determined that photo arrays were proper where the defendant's photograph had a different background (*Harrell*, 104 Ill. App. 3d at 144-45) or was "noticeably darker" than the filler photographs (*People v. Summers*, 49 Ill. App. 3d 70, 74-75 (1977)). In fact, photo arrays have been found to be unsuggestive even when defendant's image is the only one portrayed in color. See *People v. Levine*, 99 Ill. App. 3d 141, 158-60 (1981) (ultimately concluding that under the totality of the circumstances there was not a likelihood of irreparable misidentification); *People v. Hudson*, 7 Ill. App. 3d 333, 335-36 (1972).

¶ 43    Defendant also claims the photo array was unduly suggestive because it contained only four fillers. We note that while Leon identified defendant in a photo array that included five individuals, he had been presented with a different photo array the day prior. Thus, while the specific photo array where defendant was identified only had five people, Leon was presented with images of more than five individuals over both photo arrays.

¶ 44    As to the physical lineup, defendant similarly claims it was unduly suggestive because he was the only one of the five men depicted who had short, braided hair and a dark complexion. The photograph of the police lineup demonstrates that it included four other African American men of the same approximate age, all with varying skin tones. One man had his hair styled in shoulder-length braids; two had short, cropped hair; and one had a shaved head. While the men had differing skin tones or hair styles, these factors are relevant only within the context of the totality of circumstances. The participants in the lineup shared many similar features. The participants in a lineup, however, are not required to be physically identical. *Faber*, 2012 IL App (1st) 093273, ¶ 57. For example, we have routinely recognized that a lineup is not impermissibly suggestive where "the defendant was the only person in the lineup with braided hair." *People v. Love*, 377 Ill. App. 3d 306, 311 (2007); see also *People v. Kelley*, 304 Ill. App. 3d 628, 638 (1999) ("[D]efendant's hairstyles in the lineups (both the french braids and the Afro) were not so distinctive that they rendered the lineups unduly suggestive."); *People v. Trass*, 136 Ill. App. 3d 455, 463 (1985) ("The fact that [defendant] was the only man in the lineup with braided hair does not establish that the lineup was impermissibly suggestive ***.").

¶ 45    Moreover, here the facts indicate there was not a substantial likelihood of irreparable misidentification. See *Love*, 377 Ill. App. 3d at 311. There is no evidence defendant was forced to wear braids at the lineup. Additionally, Thomas was able to observe the shooter's face at the time of the offense; his identification of defendant was not based solely on defendant's hair. In fact, both Leon and Thomas testified that defendant had a hood drawn around his head, but his face remained exposed. Thus, defendant's hair style would not have been a factor in Thomas's identification of him.

¶ 46    Ultimately, based on our review of the photo array and lineup, as well as relevant case law, we necessarily reject defendant's contention that the photo array and lineup presented to Leon and Thomas were impermissibly suggestive. Accordingly, because a motion to suppress the identification of defendant from the array and lineup would not have been successful, defendant's ineffective assistance of counsel claim is without merit. See *People v. Gabriel*, 398 Ill. App. 3d 332, 349 (2010).

¶ 47    Moreover, even if we assume *arguendo* that defense counsel's performance was deficient, the suppression of the photo array and lineup would not have changed the outcome of defendant's trial where the victims had an independent basis for identifying defendant, apart from the photo array and physical lineup. *People v. Brooks*, 187 Ill. 2d 91, 126 (1999). Identification evidence that is vague or doubtful is insufficient to support a conviction. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). A single witness's identification of the accused, however, is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification. *Id.* In assessing identification testimony, we consider the following five factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972): (1) the witness's opportunity to view the defendant during the offense, (2) the witness's degree of attention at the time of the offense, (3) the accuracy of the witness's prior description of the defendant, (4) the witness's level of certainty at the subsequent identification, and (5) the length of time between the crime and the identification. *Slim*, 127 Ill. 2d at 307-08. None of these factors, standing alone, conclusively establishes the reliability of identification testimony; rather, the trier of fact is to take all of the factors into consideration. *Biggers*, 409 U.S. at 199-200.

¶ 48    Defendant first challenges the victims' testimony identifying him as the shooter. Defendant calls into question their ability to view the shooter and maintains that Thomas's view of the shooter was obstructed because the shooter's face would not have been clearly visible when Thomas hid behind the brick barrier and jumped off the porch. In regards to Leon, defendant asserts that Leon was focusing on the shooter's weapon and not on his face during the shooting.

¶ 49    While Thomas testified he hid behind the porch wall and then ran away, the evidence established that he did so after viewing the shooter's face. Further, the evidence establishes that Leon had ample opportunity to view the shooter. Although the shooter had a hood drawn over his head, the testimony established that the shooter's face was not covered. Leon was seated in his wheelchair at the base of the porch stairs when the shooter came from the gangway; his view was unobstructed, and he did not move when the shooter commenced firing his weapon. Most importantly, the shooter was not a random stranger, it was an individual both Leon and Thomas recognized from the neighborhood and knew him by his nickname.

¶ 50    In regards to the second *Biggers* factor, the witness's degree of attention at the time of the offense, the testimony was clear that Leon was focused on the shooter during the incident. While we acknowledge that Thomas's degree of attention was lessened by the fact he hid behind the porch wall and then ran away, it does not negate his ability to have initially recognized defendant as the shooter.

¶ 51    As to the third *Biggers* factor, the accuracy of the witness's prior description of the defendant, the testimony established that Leon and Thomas did not initially provide detailed descriptions of the shooter, but instead identified him by his nickname. Later, after presented with the first photo array, Leon informed the detectives that "Monkey Man" had short braids, a description that proved to be accurate.

¶ 52    The fourth *Biggers* factor goes to the witness's level of certainty at the subsequent identification. Leon and Thomas both identified defendant definitively in the photo array as well as in the lineup.

¶ 53    Lastly, while Leon did not initially identify defendant as the shooter to the responding police officers or the paramedics, he did so inform the detectives who visited him at the emergency room while he was being treated for the gunshot wound. Thomas also did not

immediately identify defendant as the shooter, but did so when the detectives interviewed him two days after the offense occurred.

¶ 54 After weighing each factor, we conclude Leon and Thomas viewed the shooter under circumstances permitting a positive identification. We observe that, "[n]ormally, the [trier of fact] decides the weight that an identification deserves, and the less reliable the [trier of fact] finds the identification to be, the less weight the [trier of fact] will give it." *People v. Rodriguez*, 387 Ill. App. 3d 812, 829 (2008) (citing *People v. Ramos*, 339 Ill. App. 3d 891, 897 (2003)). Here, the trial court was the trier of fact and had the opportunity to determine the credibility of the witnesses and the weight to be given to their testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). The trial court weighed the evidence and found that Leon and Thomas's identifications were reliable. We cannot say, when viewed in the light most favorable to the State, that the identification of defendant as the shooter was insufficient, and we will not substitute our judgment for that of the trial court in regard to the reliability or weight of the identification. As the victims had an independent basis for making their identifications, defendant was not prejudiced by trial counsel's failure to move to suppress the photo array identification; thus, defendant's claim for ineffective assistance of counsel fails for this reason as well.

¶ 55                                          Sufficiency of the Evidence

¶ 56 Defendant next contends that the State failed to prove him guilty beyond a reasonable doubt where the only evidence linking him to the crime was the identification testimony of Leon and Thomas, who were not credible. Defendant further asserts that the State failed to meet its burden of proof where the DNA evidence did not demonstrate defendant participated in the offense, the State failed to prove motive, and the witnesses viewed a suggestive photo array and lineup.

¶ 57 The State responds that it was within the province of the trial court to determine the credibility of the witnesses and that this court may not independently assess Leon's and Thomas's credibility. In addition, the State maintains that the DNA evidence does not exonerate defendant where the trial stipulation provided that it is possible to wear a garment or handle a weapon and not leave enough DNA to be detected. Lastly, the State argues that the photo array and lineup were not improper because Leon and Thomas independently identified defendant as the shooter prior to identifying defendant in the photo array or lineup.

¶ 58 When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Washington*, 2012 IL 107993, ¶ 33. On review, all reasonable inferences from the evidence are drawn in favor of the State. *People v. Martin*, 2011 IL 109102, ¶ 15. The reviewing court will not retry the defendant or substitute its judgment for that of the trier of fact on questions involving the weight of the evidence, conflicts in the testimony, or the credibility of witnesses. *Jackson*, 232 Ill. 2d at 280. A defendant's conviction will be reversed only if the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Washington*, 2012 IL 107993, ¶ 33.

¶ 59 Defendant here was convicted of first degree murder and attempted murder. A person commits first degree murder if, in performing the acts that cause a death, he or she either intends to kill or do great bodily harm to the victim or another individual, knows that the acts

- 11 -

will cause the victim's or another's death, or knows the acts create a strong probability of death or great bodily harm to the victim or another. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2012). A person commits attempted murder when, with intent to commit murder, he or she takes any substantial step towards committing murder. 720 ILCS 5/8-4(a), 9-1 (West 2012). Defendant, however, does not contest the elements of the offense but instead challenges the credibility of the victims whose testimony supported his conviction, the trial court's weighing of the DNA evidence, the State's failure to prove motive, and the reliability of the photo array and lineup identifications.

¶ 60    We initially observe that we previously determined that the photo array and lineup identification procedures were not suggestive. We also examined Leon and Thomas's identification testimony under the *Biggers* factors and concluded that the trial court's reliance on those identifications was not problematic. Consequently, these arguments as they relate to the sufficiency of the evidence are also unpersuasive.

¶ 61    Defendant, however, generally challenges the credibility of the victims' testimony identifying him as the shooter. Defendant argues that the evidence established Leon and Thomas were both likely high on marijuana at the time of the shooting. In addition, defendant argues that Leon and Thomas provided inconsistent testimony regarding the identity of the shooter; Leon testified on cross-examination that he had only known defendant "for a minute," and Thomas initially referred to defendant as "Money Man" not "Monkey Man." Defendant also argues that Leon's testimony was incredible where (1) on cross-examination, he testified he was guessing that (a) he observed defendant in a passing vehicle prior to the shooting and (b) defendant "hung out" with an opposing gang, (2) he flip-flopped regarding the color of the shooter's sweatshirt, (3) he denied there was a gang faction feud despite Vaughan's testimony otherwise, and (4) he acknowledged he was an active gang member and drug dealer at the time of the shooting.

¶ 62    The arguments set forth by defendant are a general attack on the credibility of the witnesses. Minor inconsistencies in the testimony between witnesses or within one witness's testimony may affect the weight of the evidence but does not automatically create a reasonable doubt of guilt. *People v. Adams*, 109 Ill. 2d 102, 115 (1985). The trier of fact must judge how flaws in parts of a witness's testimony, including inconsistencies with prior statements, affect the credibility of the whole. *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004). The trier of fact may accept or reject all or part of a witness' testimony. *People v. Logan*, 352 Ill. App. 3d 73, 81 (2004). The testimony of a single witness, if positive and credible, is sufficient to sustain a conviction although it is contradicted by the defendant. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009).

¶ 63    Defendant's argument regarding the sufficiency of the evidence fails because the weaknesses in the evidence that defendant cites on appeal were all presented to, considered, and rejected by the trial judge. By its verdict, the trial court determined that Leon and Thomas were telling the truth when they identified defendant as the shooter. The trial court, as trier of fact, heard the testimony of the witnesses and was best equipped to judge their credibility. *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007) (credibility determinations carry great weight and "due consideration must be given to the fact that it was the trial court and jury that saw and heard the witnesses"). We will not disturb this credibility finding on review. See *People v. Harris*, 297 Ill. App. 3d 1073, 1083 (1998) (we defer to the trial court in credibility assessments because a court of review is not in a position to observe the witness as he or she

testifies). Accordingly, in view of the record and the credibility determinations, we cannot say the evidence was so improbable or unsatisfactory as to render the verdict unreasonable.

¶ 64    Next, defendant maintains that the lack of DNA evidence creates reasonable doubt that defendant was the shooter. While the DNA that was discovered on the baseball cap, hooded sweatshirt, and handgun excluded defendant as a source, the stipulated testimony established that it was possible for someone to wear or handle these items and not leave behind any DNA. Thus, although the DNA did not definitively identify defendant as the perpetrator of this offense, it did not exonerate him from it. See *People v. Allen*, 377 Ill. App. 3d 938, 944 (2007) (the absence of DNA evidence on a handgun would not exonerate the defendant).

¶ 65    Lastly, defendant asserts that the State failed to prove motive; however, the State was not required to prove motive in the first place. See, *e.g.*, *People v. Ward*, 154 Ill. 2d 272, 320 (1992) (concluding that the prosecutor's explanation to the jury that he did not have to prove motive is a correct statement of the law, and was therefore entirely proper).

¶ 66    In sum, the evidence, viewed in the light most favorable to the State, demonstrates that a rational trier of fact could have found the essential elements of murder and attempted murder beyond a reasonable doubt. See *Washington*, 2012 IL App (1st) 107993, ¶ 33.

¶ 67                                    Due Process Violated

¶ 68    Defendant next asserts that the trial court shifted the burden of proof to him to prove his innocence, thereby violating his due process rights. Defendant acknowledges that he failed to properly raise this issue before the trial court, thus forfeiting his claim on appeal. Defendant, however, requests that this court review his claim under the plain-error doctrine. Illinois Supreme Court Rule 615(a) states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a). The plain-error rule "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). Defendant carries the burden of persuasion under both prongs of the plain-error rule. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). However, "[t]he first step of plain-error review is to determine whether any error occurred." *Id.* Therefore, we will review the issue to determine if there was any error before considering it under the plain-error doctrine.

¶ 69    It is well-established that a criminal defendant has a fundamental due process right to a fair trial that is protected by both federal and state constitutions. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. In a bench trial, the circuit court judge is the trier of fact, and as such, is required to consider all of the evidence before rendering its decision. *People v. Williams*, 2013 IL App (1st) 111116, ¶ 75. When a bench trial is conducted, the trial court is presumed to have considered only competent evidence, and that presumption will only be rebutted by affirmative evidence in the record. *People v. Simon*, 2011 IL App (1st) 091197, ¶ 91. Accordingly, where there is affirmative evidence in the record that the circuit court failed to correctly recall and consider evidence critical to fully understand and evaluate a criminal defendant's defense

- 13 -

strategy at trial, the defendant is deprived of his right to a fair trial. *People v. Mitchell*, 152 Ill. 2d 274, 323 (1992); *Williams*, 2013 IL App (1st) 111116, ¶ 75. Whether a criminal defendant's due process rights have been violated presents an issue of law, and is thus subject to *de novo* review. *People v. Stapinski*, 2015 IL 118278, ¶ 35.

¶ 70    In a criminal proceeding, the State has the burden of proving each element of the offense beyond a reasonable doubt, and this burden never shifts to the defendant. *People v. Cameron*, 2012 IL App (3d) 110020, ¶ 27. The defendant is presumed innocent of the charges against him and does not have to prove his innocence, testify, or present any evidence. *Id.* The trial court's efforts to test, support, or sustain the defense's theories, however, cannot be viewed as diluting the State's burden of proof or shifting that burden to the defendant. *People v. Howery*, 178 Ill. 2d 1, 35 (1997); *Cameron*, 2012 IL App (3d) 110020, ¶ 28. The court may comment on the implausibility of the defense's theories, as long as it is clear from the record that the court applied the proper burden of proof in finding the defendant guilty. *Howery*, 178 Ill. 2d at 34-35. The trial court is presumed to know the law, including the allocation of the burden of proof, and to apply it properly, absent a strong affirmative showing to the contrary in the record. *Id.* at 32-33.

¶ 71    In support of his contention, defendant relies on the following remarks made by the trial court in delivering the guilty verdict. The allegedly erroneous remarks are italicized for emphasis, but are presented in context:

"Thank you. I observed the witnesses while testifying. I watched their demeanor and listened to the arguments and reviewed the stipulations that have been agreed.

Concerning the DNA, the DNA certainly could include somebody in these cases. But as far as what I am looking, it says—this is on stipulation Number 76, Ms. Belna would testify that Matthew Smith cannot be excluded as a donor of the mixture of the DNA profiles on the cap.

This means he is included as a possible donor to the mixture identified on the cap. The chances a random person would be included to this mixture are 1 in 6 Blacks. That means out of—if you took the number 600, 100 Blacks would be included in that number.

If you took the Whites, if you looked at 230, then you would have 23 out of that approximately. So I mean, these DNA figures *are just really meaningless as to proving Mr. Smith was the culprit in this case*.

As to the DNA, the DNA concerning Mr. Joiner, he certainly was excluded but exclude [*sic*] for having biological material on the hat, the gun and the gray hooded sweatshirt but *that doesn't mean that he wasn't there*.

There are [*sic*] part of the stipulation is that people can handle a weapon without leaving a fingerprint, etc. So those possibilities exist. It does come down to credibility of the witnesses of Thomas and Leon Cunningham.

First off, there has been no interest or bias shown as far as why Mr. Leon Cunningham would say that Mr. Joiner was the one that shot him. He was on the porch. Remember she [*sic*] says, the seventies was [*sic*] not having problems with D Block. That was his portion of the gang. But the fact that very shortly after the shooting, Leon Cunningham comes up with the name Monkey Man.

One of the conclusions and there are probably many is that if he wanted to put this on Mr. Joiner with no other reason and Mr. Joiner wasn't there, how would he know that Mr. Joiner didn't have an alibi or Mr. Joiner wasn't in town or things to that effect.

The next thing was the cross examination [*sic*] and it was very strenuous of Thomas Cunningham. Leon Cunningham said that he did talk to his brother three days after the shooting. Thomas Cunningham said they talked sooner and I saw my brother before the lineup. We didn't talk about any shooting at the hospital.

So there's no—has been argued and proffered by the defense, *there's no independent showing that there was a connection that Leon had directly influenced Thomas in his identification process.*

The identification processes were there and there are some inconsistencies but they are not of a major group to *render the testimony of Leon Cunningham and Thomas Cunningham as unbelievable.*" (Emphases added.)

¶ 72      In the present case, we find the record lacks affirmative proof that the trial court erroneously shifted the burden of proof to defendant. In reaching its decision, the trial court specifically addressed defendant's evidence and theories, that being the credibility of Leon and Thomas, the DNA evidence, and the theory that Leon had instructed Thomas to identify defendant as the perpetrator. The record demonstrates that the trial court thoroughly considered and tested defendant's theories, which included the argument that the lack of DNA evidence exonerated him. See *Cameron*, 2012 IL App (3d) 110020, ¶ 28 ("The trial court is free to comment on the implausibility of the defense's theories, as long as it is clear from the record that the trial court applied the proper burden of proof in finding the defendant guilty."). The trial court further addressed defendant's attack on the credibility of Leon and Thomas and their identification of him as the shooter, finding (1) there was no evidence presented demonstrating Leon influenced Thomas's identification of him and (2) there were some inconsistencies between their testimonies, it was not enough to render their testimony completely unbelievable. See *Howery*, 178 Ill. 2d at 34-35. Here, defendant appeals from a bench trial, where the trial court served as the trier of fact. The trial court may draw or reject inferences based on the evidence and is presumed to know the law. *Id.* at 32-33. The record is clear that the trial court knew and properly applied the burden of proof and its comments do not support a claim that it erroneously shifted the burden to defendant. Having determined that no error occurred, we need not consider further the parties' arguments on this issue about forfeiture and plain error.

¶ 73                    The Constitutionality of Defendant's Sentence

¶ 74      Defendant argues his sentence of 71 years' imprisonment violates the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) as applied to him.

¶ 75      The applicable sentencing statutes mandated that the trial court add firearm enhancements to his sentences for murder and attempted murder, that his murder and attempted murder sentences be served consecutively, and that he must serve the entire murder sentence and 85 percent of the attempted murder sentence. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2012) (25 years to be added to murder sentence if firearm used proximately causes death or great bodily harm); 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2012) (20 years to be added to attempted murder sentence if firearm used); 730 ILCS 5/5-8-4(d)(1) (West 2012) (murder and attempted murder

sentences to be served consecutively); 730 ILCS 5/3-6-3(a)(2)(i)-(ii) (West 2012) ("truth in sentencing" mandates defendant must serve 100 percent of murder sentence and 85 percent of attempted murder sentence).

¶ 76    Although the trial court sentenced defendant to the minimum sentence, his aggregate sentence totals 71 years (of which defendant must serve at least 66 years). Defendant, relying on *Miller* and its progeny, asserts that this lengthy term is actually a mandatory *de facto* life sentence, which violates the federal constitution and the proportionate penalties clause of the Illinois Constitution.

¶ 77    In response, the State asserts that a sentence guaranteeing a geriatric release is not equivalent to an actual or *de facto* life sentence. In this instance, defendant is eligible for release at age 83; thus, the State argues, *Miller* does not apply because he is not serving a sentence without the possibility of parole.

¶ 78    The eighth amendment of the United States Constitution prohibits "cruel and unusual punishments." U.S. Const., amend. VIII. This provision prohibits not only "inherently barbaric punishments" but those "disproportionate to the crime." *Graham v. Florida*, 560 U.S. 48, 59 (2010). The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.

¶ 79    A strong presumption exists that statutes are constitutional and courts will uphold a statute whenever reasonably possible, resolving all doubts in favor of the statute's validity. *People v. Patterson*, 2014 IL 115102, ¶ 90. In addition, the challenging party has the burden of rebutting this presumption. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 43. We review a statute's constitutionality *de novo*. *Patterson*, 2014 IL 115102, ¶ 90.

¶ 80    Defendant argues that his sentence is unconstitutional under *Miller*. In *Miller*, the Supreme Court held that life without parole is unconstitutional for juvenile offenders if the sentence is mandatory. *Miller*, 567 U.S. at 470. The Court reasoned that minors are constitutionally different from adults for sentencing purposes, being more impulsive and vulnerable to negative influences and peer pressures than adults, and further lack fully-formed characters so that their actions do not necessarily indicate irreversible depravity. *Id.* at 471-77. The Court, however, continued to allow such sentences when they were based on judicial discretion. *Id.* at 479. The Court made *Miller*'s holding retroactive in *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 736 (2016), and also instructed that states could remedy a *Miller* violation by allowing juvenile offenders with mandatory life sentences to become eligible for parole. *Id.* at ___, 136 S. Ct. at 736. "So far, the Supreme Court has reserved these rulings for the most severe punishments: death or life imprisonment." *People v. Evans*, 2017 IL App (1st) 143562, ¶ 11.

¶ 81    Although the juvenile defendant in *Miller* was sentenced to a mandatory term of life imprisonment, our supreme court in *People v. Reyes*, 2016 IL 119271, ¶ 9, applied the holding in *Miller* to a "mandatory term-of-years sentence that cannot be served in one lifetime." The juvenile defendant in *Reyes*, who was 16 years old when he committed the offense, received a mandatory minimum sentence of 20 years' imprisonment for first degree murder, plus a mandatory 25-year firearm enhancement, and 26 years for each of his two attempted murder convictions, consisting of the minimum 6-year sentence for attempted murder plus a 20-year mandatory firearm enhancement. *Id.* ¶ 2. Pursuant to statute, the defendant was required to serve his sentences consecutively; therefore, he "was sentenced to a mandatory minimum

aggregate sentence of 97 years' imprisonment" and "required to serve a minimum of 89 years" before being eligible for release. *Id.*

¶ 82 The State conceded, and the court agreed, "that defendant will most certainly not live long enough to ever become eligible for release." *Id.* ¶ 10. Our supreme court reasoned that such a sentence "has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison." *Id.* ¶ 9. The court held that to sentence a juvenile defendant to a mandatory term "that is the functional equivalent of life without the possibility of parole," without consideration of the mitigating factors of youth set forth in *Miller*, "constitutes cruel and unusual punishment in violation of the eighth amendment." *Id.*

¶ 83 In this case, as in *Reyes*, defendant was sentenced to the statutory minimum. See *id.* ¶ 2. Likewise, defendant here committed offenses in a single course of conduct that subjected him to a legislatively-mandated sentence of 71 years, with the earliest opportunity for release after 66 years. His sentence included two mandatory firearm enhancements. Because defendant was 16 years old at the time he committed the offenses, the sentencing scheme mandates that he will remain in prison until at least the age of 83. In our view, this constitutes a mandatory *de facto* life sentence in violation of the eighth amendment. See *id.* ¶ 9.

¶ 84 In reaching this conclusion, we find *People v. Buffer*, 2017 Il App (1st) 142931, to be instructive. In that case, the 16-year-old defendant was found guilty of murder for the shooting death of the victim, including that he personally discharged the firearm that caused the victim's death. *Id.* ¶ 3. The defendant was sentenced to 25 years for murder plus a mandatory 25-year firearm enhancement for a total of 50 years' imprisonment with 3 years of mandatory supervised release. *Id.* ¶¶ 26, 42. In sentencing the defendant, the trial court also indicated that it considered not only the gravity of the offense, but also the defendant's potential substance abuse issues, treatment, potential for rehabilitation, and age. *Id.* While the defendant's case was pending, the United States Supreme Court decided *Miller*; but nonetheless, his conviction was affirmed. *Id.* ¶¶ 29, 31. Thereafter, the defendant filed a postconviction petition arguing his 50-year sentence was a *de facto* life sentence that violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution. *Id.* ¶ 35. His petition, however, was summarily dismissed by the circuit court as being frivolous and patently without merit. *Id.* ¶ 36.

¶ 85 Similar to defendant in the case at bar, on appeal Buffer maintained his 50-year sentence was a *de facto* life sentence that violated his constitutional rights both under the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution. *Id.* ¶ 41. In addition, the defendant asserted that because of the interaction of the sentencing statutes, including the mandatory firearm enhancement statute and the truth in sentencing statute, the trial court was prevented from exercising any discretion or taking into consideration his youth and rehabilitative potential. *Id.* ¶ 42.

¶ 86 In considering whether the defendant's sentence constituted a *de facto* life sentence, the *Buffer* court stated, "While our supreme court in *Reyes* extended *Miller* to *de facto* life sentences because they 'cannot be served in one lifetime' it left open the question of what age constitutes a 'lifetime' and who gets to make that determination." *Id.* ¶ 57. The *Buffer* court went on to acknowledge the varying opinions of our appellate court as to when it is appropriate for a court of review to reflect on questions of biology and statistics, specifically those regarding an inmate's projected life span. *Id.* (citing *People v. Harris*, 2016 IL App (1st)

141744, ¶ 52); see also *People v. Jackson*, 2016 IL App (1st) 143025, ¶ 57 (recognizing that appellate courts "need a consistent and uniform policy on what constitutes a *de facto* life sentence"). But ultimately, the court found the defendant's 50-year sentence was a *de facto* life sentence, as he would not have a "meaningful opportunity for release." *Buffer*, 2017 Il App (1st) 142931, ¶ 62.

¶ 87    In so concluding, the *Buffer* court, like the court in *People v. Sanders*, 2016 IL App (1st) 121732-B, ¶ 26, took judicial notice of the U.S. Sentencing Commission Preliminary Quarterly Data Report, which indicated that "a person held in a general prison population has a life expectancy of about 64 years and that this estimate probably overstates the average life expectancy for minors committed to prisons for lengthy terms." (Internal quotation marks omitted.) *Buffer*, 2017 IL App (1st) 142931, ¶ 59. The *Buffer* court observed that this proposition was also adopted by the appellate court in *Harris*. See *Harris*, 2016 IL App (1st) 141744, ¶¶ 53-54 (agreeing with *Sanders* that the lower life expectancy of minors committed to prison for lengthy terms was "[n]ot surprising, given the harshness of a lifetime spent in a state penitentiary"). The *Buffer* court further noted that "while our supreme court has not yet attempted to delineate what constitutes a lifetime, in finding *de facto* life sentences unconstitutional, it relied heavily on the reasoning of the Wyoming Supreme Court in *Bear Cloud v. State*, 2014 WY 113, ¶ 33, 334 P.3d 132 (Wyo. 2014)," which "explicitly found that an aggregate 45-year sentence imposed on a 16-year-old triggered the eighth amendment's prohibition against mandatory life sentences." *Buffer*, 2017 IL App (1st) 142931, ¶ 61 (citing *Bear Cloud*, 2014 WY 113, ¶¶ 31-37).

¶ 88    While the *Buffer* court ultimately determined the 16-year-old defendant's 50-year sentence was a mandatory *de facto* life sentence, the case before us is much stronger. Here, defendant was 16 years old when he committed the offenses and was sentenced to 71 years' imprisonment, with the possibility of being released in 66 years, making him 83 years of age on his projected parole date. An examination of similar cases involving mandatory *de facto* life sentences reveals that defendant's 71-year sentence compares favorably with other *de facto* life sentences. See *People v. Nieto*, 2016 IL App (1st) 121604, ¶ 42 (78-year sentence); *Harris*, 2016 IL App (1st) 141744, ¶ 54 (76-year sentence); *People v. Ortiz*, 2016 IL App (1st) 133294, ¶ 23 (60-year sentence, allowing release at age 75); *Buffer*, 2017 IL App (1st) 142931, ¶ 62 (50-year sentence, allowing release at age 69). Thus, in accordance with our case law, we conclude defendant's sentence, where he would be released at the earliest at age 83, is a mandatory *de facto* life sentence in violation of the eighth amendment.

¶ 89    Moreover, the record here demonstrates that the only evidence regarding defendant's youth, immaturity, or potential for rehabilitation trial court considered was contained in the presentencing investigation report. The record further discloses that the trial court rendered no express findings about defendant's specific characteristics of youth. As explained by our supreme court:

"A mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison. *Miller* makes clear that a juvenile may not be sentenced to a mandatory, unsurvivable prison term *without first considering in mitigation his youth, immaturity, and potential for rehabilitation*." (Emphasis added.) *Reyes*, 2016 IL 119271, ¶ 9.

¶ 90    In this case, the State's attorney did not request the maximum sentence (natural life in prison), but instead asked that defendant receive "a substantial sentence." In mitigation, defense counsel noted that defendant had no criminal history, strenuously denied defendant was a gang member, and emphasized the consistent support defendant received from his family throughout his trial. Defense counsel declined to raise any other arguments stating, "I can make arguments as indicated in the statute, the sentencing statute, as to his possibility of rehabilitation and all of those things and just frankly, Judge, seems useless when a sentencing minimum is so high." Thereafter, the trial court sentenced defendant to the minimum possible sentences. It is clear from the record that the mandatory firearm enhancements operated to tie the trial court's hands when sentencing defendant. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2012); 720 ILCS 5/8-4(c)(1)(D) (West 2012). While we acknowledge that defendant was sentenced prior to the *Reyes* decision, it is apparent that the trial court was limited by the sentencing scheme and thus did not expressly consider the factors that the *Miller* court found to be imperative when sentencing a juvenile to a mandatory, unsurvivable prison term. See *Miller*, 567 U.S. at 480; *Reyes*, 2016 IL 119271, ¶ 9; *Ortiz*, 2016 IL App (1st) 133294, ¶¶ 23, 25 (the trial court must take into consideration the corresponding characteristics of youth as outlined in *Miller* and *Montgomery* when sentencing a defendant). Under these circumstances, where the *Miller* factors were not utilized in imposing a discretionary sentence of natural life without the possibility of parole, a juvenile defendant is entitled to relief. *Nieto*, 2016 IL App (1st) 121604, ¶ 49. Accordingly, defendant's sentence violated the eighth amendment of the United States Constitution. As we have concluded that defendant's sentence violated the eighth amendment, we need not address his argument that it violated the proportionate penalties clause of the Illinois Constitution. See *Buffer*, 2017 IL App (1st) 142931, ¶ 64.

¶ 91                                New Sentencing Provisions for Juveniles

¶ 92    Lastly, defendant argues that the new sentencing provision—which states that the court "may, in its discretion, decline to impose any otherwise applicable sentencing enhancement based upon firearm possession, possession with personal discharge, or possession with personal discharge that proximately causes great bodily harm, permanent disability, permanent disfigurement, or death to another person"—applies retroactively, and thus the matter must be remanded for a new sentencing hearing. 730 ILCS 5/5-4.5-105(b) (West 2016). After defendant's brief was filed, our supreme court addressed the exact question at issue here in *People v. Hunter*, 2017 IL 121306, and definitively resolved the issue unfavorably to defendant's position. Defendant acknowledges this fact in his reply brief, conceding the argument.

¶ 93    Furthermore, as discussed above, we are remanding this matter for resentencing. Accordingly, where "a defendant's sentence is vacated on appeal and the matter remanded for resentencing, under section 4 of the Statute on Statutes [(5 ILCS 70/4 (West 2016))], the defendant may elect to be sentenced under the law in effect at the time of the new sentencing hearing." *Id.* ¶ 54.

¶ 94                                              CONCLUSION

¶ 95    For the reasons stated above, defendant's conviction is affirmed. Defendant's sentence, however, is vacated, and the matter is remanded to the circuit court for resentencing.

¶ 96        Affirmed in part, vacated in part, and remanded.